IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | | |
|---|---|---|
| POWER HOME SOLAR, LLC, | ) | Civil Action No. 3:20-cv-00042 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| SIGORA SOLAR, LLC, et al., | ) | |
| Defendants. | ) | By:   Joel C. Hoppe |
| | ) | United States Magistrate Judge |

This matter is before the Court on referral for a Report and Recommendation on

Defendants' Dispositive Motion for Claim-Terminating Sanctions ("Motion"). Defs.' Mot. for

Sanctions, ECF Nos. 115, 119; *see* ECF No. 117. The motion has been fully briefed and argued.

*See* Pl.'s Obj. to Defs.' Mot. for Sanctions, ECF No. 121 ("Pl.'s Opp'n Br."); Defs.' Reply in

Supp. of Mot. for Sanctions, ECF No. 122 ("Defs.' Reply"). For the reasons stated below, I

respectfully recommend that the presiding District Judge GRANT in part and DENY in part

Defendants' Motion.

I. Factual Background & Procedural History

This civil action began less than a year ago as a run-of-the-mill contract dispute between

an employer and its former employees over the alleged breach of the employees' non-compete

agreements. Plaintiff Power Home Solar, LLC ("PHS") sued a competitor, Defendant Sigora

Solar, LLC ("Sigora"), and two of PHS's former sales representatives, Defendants Raven

Stephens ("Stephens") and Brian Ventura ("Ventura") (collectively, "Defendants"). *See* Notice

of Removal ¶¶ 1–4, 6, 15, ECF No. 1. PHS alleged, *inter alia*, that Stephens and Ventura

breached non-compete agreements and misappropriated trade secrets. *Id.* at ¶ 6; *see also* Notice

of Removal Ex. 2, Compl. ¶¶ 65–69, 76–98, ECF No. 1-3. Central to its claims, PHS asserted

that Stephens and Ventura executed non-compete agreements while employed by PHS that

1

prohibited them from using its confidential information outside the scope of their employment and from competing with it for twelve months following termination. *See* Compl. ¶¶ 29–41.

But a few months after this litigation began, it took an unusual turn. In October 2020, Stephens and Ventura asserted that they never signed or executed the underlying non-compete agreements while working for PHS. *See* Defs.' Answer & Countercls. 21, 23–34, ECF No. 36. Stephens acknowledged that PHS had produced a non-compete agreement purportedly bearing her electronic signature. *Id.* at 23. But she claimed that she never *actually* signed that agreement, electronically or otherwise. *Id*. Similarly, Ventura noted that PHS had not produced a copy of his signed non-compete agreement, and he claimed that he had not signed one. *See id.* at 24. Defendants therefore claimed that PHS had "premised [its claims] on forged documents" and had perpetrated fraud on the Court. *Id.* at 21. Defendants' allegations of forgery and fraud on the court prompted the presiding District Judge to hold in abeyance a pending Rule 12(b)(6) motion and order expedited discovery on those allegations. Order of Dec. 16, 2020, ECF No. 59. Defendants' Motion concerns PHS's alleged failures during expedited discovery.

A.    *Stephens and Ventura begin working for PHS*

Stephens and Ventura both began working for PHS in August 2018. Compl. ¶¶ 44, 50. The parties do not dispute that Stephens and Ventura each executed a "Sales Commission Agreement" ("SCA") at the time they were hired. *See* Compl. ¶ 37; Defs.' Second Supp. Br. in Supp. of Mot. to Dismiss 2, ECF No. 53 ("Defs.' Second Supp. Br."); Pl.'s Opp'n Br. Ex. 3, S. Murphy Dep. Tr. 42 (Feb. 26, 2021), ECF No. 121-3 ("Murphy Dep. Tr.").[1] The SCAs were

---

[1] PHS did not label all the exhibits attached to its brief opposing the instant Motion. *See generally* Pl.'s Opp'n Br. & Exs., ECF No. 121 to 121-10. Accordingly, I refer to PHS's exhibits by the order in which they are attached to its brief. For example, the third exhibit attached to PHS's brief, ECF No. 121-3, is referred to herein as "Ex. 3." Pinpoint citations to other documents filed electronically in this Court use the page numbers and the exhibit labels assigned by the filing party.

employment agreements, and they did not include explicit non-compete provisions. *See, e.g.*, State Ct. R., Compl. Ex. C, Sales Commission Agreement of B. Ventura (Aug. 2, 2018), ECF No. 19, at 44–47 ("Ventura's SCA"); *see also* Defs.' Mot. for Sanctions Ex. 2, Rule 30(b)(6) Dep. Tr. 25–26, 38 (Feb. 25, 2021), ECF No. 119-2 ("Rule 30(b)(6) Dep. Tr."). The SCAs did, however, include the following language:

> **Confidentiality and Non-Disclosure**
> You agree to abide by the attached EMPLOYEE CONFIDENTIALITY AND NON-DISCLOSURE/NON-SOLICITATION AGREEMENT, which you will be required to sign before starting your employment with the Company.

Ventura's SCA, ECF No. 19, at 46; *see also* Rule 30(b)(6) Dep. Tr. 25–26, 38; Murphy Dep. Tr. 42–43. Thus, the SCAs referenced a separate agreement relating to confidentiality, non-disclosure, and non-solicitation that the SCAs specified would be "attached" and that employees had to sign separately before working for PHS. Yet, the referenced agreement was not attached to the signed SCAs that PHS filed with its Complaint. *See* Rule 30(b)(6) Dep. Tr. 18–21, 36–38.

B.      *Stephens allegedly signs a "Restrictive Covenants and Invention Assignment Agreement"*

PHS claims that it updated its employment documents in April 2019 and asked its employees to sign a stand-alone non-compete agreement titled, the "Restrictive Covenants and Invention Assignment Agreement" ("RCIAA") at that time. *See* Pl.'s Opp'n Br. Ex. 7, Pl.'s Am. Resp. & Objs. to Sigora's Corrected Second Set of Interrogs. 4 (Feb. 12, 2021), ECF No. 121-7 (Interrog. 2). PHS has produced an RCIAA that purportedly bears Stephens's electronic signature. *See* State Ct. R., Compl. Ex. B, RCIAA of R. Stephens (Apr. 1, 2019), ECF No. 19, at 39–43 ("Stephens's RCIAA"). PHS alleges that Stephens electronically signed her RCIAA through its third-party human resources management software, Paycor, on April 1, 2019. *See* Compl. ¶¶ 29–35; Pl.'s Opp'n Br. Ex. 4, Pl.'s Am. Resp. & Objs. to Stephens's First Set of Interrogs. 4–5 (Feb. 12, 2021), ECF No. 121-4 (Interrogs. 1 & 5). The agreement contains

3

multiple blank spaces for the employee's name, hire date, wet signature, and date of signature.
*See* Stephens's RCIAA, ECF No. 19, at 39, 43. None of them are filled in. *Id.* The agreement
does, however, contain a block of text on the bottom left-hand corner of each page, which reads:

> Electronically signed by:
> *Raven Stephens* [(unintelligible text)]
> 4/1/2019 7:41:48 PM
> IP Address: 99.203.16.231

*Id.* at 39–43. Thus, PHS alleges that Stephens executed a non-compete agreement during her
course of employment and is bound by its terms. Pl.'s Am. Resp. & Objs. to Stephens's First Set
of Interrogs. 4–5, ECF No. 121-4 (Interrogs. 1 & 5); *see also* Compl. ¶¶ 29–35.

Stephens, on the other hand, claims that she never signed the RCIAA. She acknowledges
that PHS has produced a copy of the company's January 2019 version of the RCIAA that
purports to bear her electronic signature. Defs.' Answer & Countercls. 23; *see* Stephens's
RCIAA, ECF No. 19, at 39–43 ("VERSION 1 – UPDATED JANUARY 2019"). But she alleges
that she had never seen it before PHS produced it in connection with this lawsuit. Defs.' Answer
& Countercls. 23. Moreover, she explains that she could not possibly have created the electronic
signature on the agreement because she was "physically present in Charlottesville, Virginia at
7:41 pm on April 1, 2019," while the "[t]he IP Address on the face of the electronic signature
stamp (99.203.16.231) traces to Elkridge, Maryland." *Id.* Thus, she claims that the RCIAA
bearing her electronic signature was forged. *Id.*

C.    *PHS claims Ventura signed a non-compete agreement*

PHS's contentions about whether, and when, Ventura signed a non-compete agreement
have evolved over the course of this litigation. PHS initially asserted that Ventura signed a non-
compete agreement "similar" to Stephens's RCIAA "when he was employed by PHS on or about
August 6, 2018." Compl. ¶ 36. But PHS has not been able to produce a copy of any such

agreement. Murphy Dep. Tr. 51–53. It has not been able to produce a copy of the "Employee

Confidentiality and Non-Disclosure/Non-Solicitation Agreement" that was referenced in

Ventura's SCA. Murphy Dep. Tr. 39–40. And it has not produced an RCIAA for Ventura, who

worked at PHS in April 2019 when the company says it updated its employment documents and

asked employees to sign RCIAAs through Paycor. *Id.* at 51–53; *see also* Compl. ¶ 50. PHS

asserts that it is still looking for Ventura's signed non-compete agreement. Murphy Dep. Tr. 51–

53. But it also asserts that, regardless of whether Ventura signed a stand-alone non-compete

agreement, he was bound by non-compete obligations because he signed his SCA, which

"referenced and incorporated" them. *See* Compl. ¶ 37; *see also id.* ¶¶ 36–40 (explaining that all

PHS employees are aware of their non-compete obligations and therefore "knew or should have

known" of their obligations not to disclose PHS's confidential information or compete with PHS

for a period of twelve months after termination).

Ventura concedes that he signed an employment agreement—the SCA—when he began

working for PHS in August 2018. Defs.' Answer & Countercls. 24. But he contends that he

never signed "*any* agreement that restricted his ability to work for another employer that

competes with [PHS], that restricted his ability to solicit former co-workers, that restricted his

ability to solicit [PHS]'s former potential customers or customers, or that restricted his ability to

use or disclose purportedly confidential information or documents." Defs.' Second Supp. Br. 5–

6; *see also* Defs.' Second Supp. Br. Ex. A, Decl. of B. Ventura ¶¶ 5–6 (Dec. 7, 2020), ECF No.

53-2. He never "execute[d] an agreement entitled 'Restrictive Covenants and Invention

Assignment Agreement'" or an agreement entitled "Employee Confidentiality and Non-

Disclosure/Non-Solicitation Agreement." Defs.' Second Supp. Br. 5.

D.    *Defendants submit additional evidence of the alleged forgeries*

In November 2020, Defendants filed an unopposed motion to stay discovery on the merits. *See* Defs.' Mot. to Stay, ECF No. 46. They asked the Court to pause all proceedings pending the resolution of a motion to dismiss that they had filed earlier in the year. *See id.* United States District Judge Thomas T. Cullen, presiding, granted the motion. *See* Order of Nov. 13, 2020, ECF No. 48. He also ordered additional briefing on Defendants' motion to dismiss. *See* Order of Nov. 24, 2020, ECF No. 51. In their supplemental brief, Defendants submitted additional evidence to bolster their allegations of forgery. *See generally* Defs.' Second Supp. Br. They produced declarations from two other individuals formerly employed by PHS—Ben Parrish ("Parrish") and Harris Parker Schram ("Schram")—who were named as defendants in a lawsuit brought by PHS in North Carolina state court ("the North Carolina Action") for allegedly violating restrictive covenant agreements, which they denied signing. *Id.* at 3–4, 6–7; *see also* Defs.' Second Supp. Br. Ex. E, Decl. of B. Parrish ¶¶ 3–5 (Dec. 7, 2020), ECF No. 53-5; Defs.' Second Supp. Br. Ex. F, Decl. of H. Parker Schram ¶¶ 3–6 (Dec. 7, 2020), ECF No. 53-6. In the North Carolina Action, PHS alleged that Parrish and Schram electronically signed RCIAAs or similar non-compete agreements. *See generally* Defs.' Second Supp. Br. 6. PHS had produced copies of their purported non-compete agreements, which show that Parrish's non-compete agreement was electronically signed on April 1, 2019 at 7:10 pm (just 31 minutes before Stephens's RCIAA was electronically signed) and that Schram's non-compete agreement was electronically signed two days later on April 3, 2019 at 4:19 pm. *Id.*

PHS also filed a supplemental brief. *See generally* Pl.'s Second Supp. Br. in Opp'n to Mot. to Dismiss, ECF No. 56. It argued that Defendants' allegations of forgery were "inappropriate at th[e] time," as they "ask[ed] th[e] Court to make rulings and a judgment on a

claim of the case before the validity of the [RCIAA] has been adjudicated, and thus, f[ell] outside the scope of a 12(b)(6) motion to dismiss." *Id.* at 2–3; *see also id.* at 4–5.

Two weeks later, Judge Cullen entered a Memorandum Opinion regarding Defendants' allegations of forgery and fraud. *See* Mem. Op. of Dec. 16, 2020, ECF No. 58. He explained that "what began as a routine motion to dismiss ha[d] taken a potentially ominous turn":

> Defendants allege—and they offer what appears to be credible evidence to back it up—that they never signed these employment agreements, and that the employment agreements PHS presented in this lawsuit are forgeries. These are incredibly serious allegations indicating, if Defendants are to be believed, that PHS may have perpetrated a fraud on this court.

*Id.* at 1. Because Defendants' allegations of forgery were susceptible to "being substantiated (or not) through relatively limited discovery and an evidentiary hearing," *id.* at 2, Judge Cullen ordered the parties to conduct discovery specifically regarding Defendants' allegations of forgery, *id.* at 13. Judge Cullen also declined PHS's invitation to "ignore serious allegations of fraud for purposes of [resolving] the motion to dismiss," *id.* at 10, held all other matters and discovery in abeyance, and set an evidentiary hearing on Defendants' allegations of forgery, *id* at 10–11.[2] He found an evidentiary hearing "essential to determine if PHS has perpetrated fraud on the court by initiating a lawsuit based on forged documents; whether a contractual agreement exists between the parties; whether that agreement controls this court's review of the legal claims; and if not, what the next appropriate step in this litigation is." *Id.* at 10. Thus, Judge Cullen directed the parties to "be prepared to present all relevant witnesses, including the litigants in the North Carolina Action if necessary" and ordered PHS to "produce Ventura's [non-compete] agreement, if it exists." *Id.* Finally, Judge Cullen noted that if Stephens's and

---

[2] The evidentiary hearing was initially set for mid-February. *See* Mem. Op. of Dec. 16, 2021 13, ECF No. 58; Order of Dec. 21, 2020, ECF No. 63. Judge Cullen later rescheduled the hearing to March 9–10, 2021. *See* Order of Jan. 15, 2021, ECF No. 71.

Ventura's non-compete agreements were in fact forged, "there will be a significant question of whether it will be appropriate to levy sanctions against PHS," including dismissal of its claims. *Id.* at 11.

E.    *Defendants depose PHS's Rule 30(b)(6) designee*

Defendants served a Notice of Rule 30(b)(6) Deposition upon PHS on February 5, 2021. Defs.' Mot. for Sanctions Ex. 1, Notice of Rule 30(b)(6) Dep. of Power Home Solar, LLC, ECF No. 119-1 ("Rule 30(b)(6) Dep. Notice"). The notice identified seventeen topics on which Defendants intended to depose PHS's designated corporate representative(s). *Id.* at 5–7. These topics asked PHS to identify individuals who worked in PHS's human resources department since January 2018; identify individuals responsible for obtaining and maintaining signed employment documents; provide details about how or why PHS contends Stephens, Ventura, Parrish, and Schram *actually* signed non-compete agreements; explain why Ventura's purported non-compete agreement could not be found; identify individuals with access to PHS employees' email accounts and Paycor accounts (who thus might have had the ability to forge the agreements at issue); and provide details about law enforcement investigations into PHS or its employees for forgery and/or notary fraud, among other things. *See id.* (listing all seventeen topics).

On February 17, PHS "unqualifiedly designated Meredith Hope Branch to testify as its sole Rule 30(b)(6) corporate designee." Defs.' Mot. for Sanctions 2. On February 25, Branch testified, in her capacity as PHS's Rule 30(b)(6) designee, that she was employed as PHS's Senior Human Resources Manager and that she had worked for PHS since April 2020. *Id.* at 9. She provided some basic information about her educational credentials, *id.* at 8, her job title and duties, *id.* at 8–10, the current structure of PHS's HR department, *id.* at 10–11, and some current

HR procedures, *id.* at 45. But she could not provide substantive information on any of the seventeen topics listed in the deposition notice and asserted that she had not prepared to testify on behalf of PHS about any of them. *Id.* at 14–16, 28–29, 39, 64–71.

F.    *Defendants move for Rule 37(d) sanctions*

On March 4, 2021, Defendants filed the instant Motion for claim-terminating sanctions. They contend that PHS's "wholesale failure to produce an adequately prepared and educated Rule 30(b)(6) corporate designee for deposition" warrants sanctions under Federal Rule of Civil Procedure 37(d). Defs.' Mot. for Sanctions 1. They further argue that this failure follows PHS's "repeated and continuing refusal to meaningfully respond to interrogatories and document requests." *Id.* at 3. Thus, they ask the Court to impose significant sanctions, including dismissal of PHS's claims or default judgment in Defendants' favor. *Id.* at 1–3.

Defendants filed their Motion shortly before Judge Cullen was supposed to hold the evidentiary hearing on March 9 and 10, 2021. Because Defendants claimed that "they ha[d] been unable to obtain important—if not critical—discovery for the upcoming hearing" and sought "dismissal of this action" as a sanction, Judge Cullen delayed the hearing indefinitely pending resolution of Defendants' Motion for Sanctions. *See* Order of Mar. 5, 2021, ECF No. 117.

## II. The Legal Framework

Federal Rule of Civil Procedure 37(d)(1) permits courts to impose sanctions when a party's Rule 30(b)(6) corporate designee "fails, after being served with proper notice, to appear for that person's deposition." Fed. R. Civ. P. 37(d)(1)(A)(i).[3] Rule 37(d) applies when a corporate designee either (1) does not appear for her deposition or (2) appears but is unwilling or

---

[3] Federal Rule of Civil Procedure 37(d)(1) also applies to other discovery misconduct. It permits courts to impose sanctions when a party fails to attend its own deposition, fails to serve answers to interrogatories, or fails to respond to a request for inspection. *See* Fed. R. Civ. P. 37(d)(1)(A)(i)–(ii).

unprepared to testify knowledgeably on the noticed deposition topics. *See Black Horse Lane Assocs., L.P. v. Dow Chem. Corp.*, 228 F.3d 275, 304 (3d Cir. 2000) ("In reality if a Rule 30(b)(6) witness is unable to give useful information he is no more present for the deposition than would be a deponent who physically appears for the deposition but sleeps through it."); *Graham v. Dhar*, No. 1:18cv274, 2019 WL 6999688, at *2 (S.D. W. Va. Dec. 19, 2019) ("It has . . . been widely established that '[p]roducing an unprepared [Rule 30(b)(6)] witness is tantamount to failure to appear.'") (alterations in original) (quoting *Scott Hutchison Enters., Inc. v. Cranberry Pipeline Corp.*, 318 F.R.D. 44, 54 (S.D. W. Va. 2016)). Rule 37(d)(3) provides that sanctions for such conduct "may include any of the [six] orders listed in Rule 37(b)(2)(A)(i)–(vi)": (1) "directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;" (2) "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;" (3) "striking pleadings in whole or in part;" (4) "staying further proceedings until the order is obeyed;" (5) "dismissing the action or proceeding in whole or in part;" or (6) "rendering a default judgment against the disobedient party." Fed. R. Civ. P. 37(b)(2)(A)(i)–(vi); *see also* Fed. R. Civ. P. 37(d)(3). Moreover, instead of or in addition to the above-listed sanctions, courts assessing sanctions under Rule 37(d)(1) generally "must" require the party failing to act, its counsel, or both "to pay the reasonable expenses, including attorney's fees, caused by the failure." Fed. R. Civ. P. 37(d)(3) (mandating fee-shifting "unless the failure was substantially justified or other circumstances make an award of expenses unjust").

The Fourth Circuit has developed a four-part test for determining whether (and, if so, which) Rule 37(d) sanctions are appropriate in the particular case. *Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305, 348 (4th Cir. 2001) (en banc). The district court "must

determine (1) whether the noncomplying party acted in bad faith, (2) the amount of prejudice

that noncompliance caused the adversary, (3) the need for deterrence of the particular sort of

non-compliance, and (4) whether less drastic sanctions would have been effective." *Id.* at 348;

*see also S. Mgmt. Corp. Ret. Tr. v. Rood*, 532 F. App'x 370, 372–73 (4th Cir. 2013) (per curiam).

Using that framework, district courts have discretion to craft sanctions appropriate to "fit[] the

case at hand." *Taylor v. Specialty Mktg., Inc.*, 985 F.2d 553 (Table), 1993 WL 21080, at *2 (4th

Cir. 1993) (per curiam). "[T]he proper sanction must be no more severe than is necessary to

prevent prejudice to the [opposing party]." *T-Zikssari v. Glendening*, 59 F.3d 167 (Table), 1995

WL 371666, at *4 (4th Cir. 1995). And, the courts' "range of discretion is more narrow" when

contemplating the severe sanctions of dismissal and default judgment.[4] *Hathcock v. Navistar*

*Int'l Transp. Corp.*, 53 F.3d 36, 40 (4th Cir. 1995) (default judgment); *see Kelly*, 589 F. App'x at

146 (dismissal).

## III. Discussion

Defendants argue that PHS's failure to prepare its corporate representative for deposition

is the latest of PHS's failures to meaningfully engage in the discovery process. Defs.' Mot. for

Sanctions 1–2. Accordingly, Defendants urge the Court to impose significant sanctions on PHS.

*Id.* They seek:

- An Order barring PHS from supplementing answers given during the [Rule] 30(b)(6) deposition of PHS on February 25, 2021;

---

[4] Default judgment must be imposed sparingly because it "represents in effect an infringement upon a party's right to trial by jury under the seventh amendment and runs counter to sound public policy of deciding cases on their merits, and against depriving a party of his fair day in court." *Wilson v. Volkswagen of Am., Inc.*, 561 F.2d 494, 503–06 (4th Cir. 1977)(cleaned up); *see also United States v. Wright*, 187 F.3d 633 (Table), 1999 WL 507119, at *3, *5 (4th Cir. 1999). Similarly, dismissal is an "'extreme sanction' that is reserved for 'only the most flagrant case, where the party's noncompliance represents bad faith and callous disregard for the authority of the district court and the Rules.'" *Kelly v. Suntrust Bank*, 589 F. App'x 146, 146 (4th Cir. 2015) (quoting *Mut. Fed. Sav. & Loan Ass'n v. Richards & Assocs., Inc.*, 872 F.2d 88, 92 (4th Cir. 1989) ("*Mut. Fed.*")); *see also T-Zikssari*, 1995 WL 371666, at *4 ("[D]ismissal with prejudice should . . . be a sanction of last resort.").

- An Order directing that the allegations of forgery of Ventura's and Stephens's . . . non-compete agreements [be] conclusively established;

- An Order striking PHS's Complaint and affirmative defenses to the Defendants' Counterclaims, or in the alternative, entering default judgment on their claims and the Counterclaims; and

- An Order requiring PHS to pay Defendants' attorneys' fees, costs, and expert fees associated in any respect with (1) the preparation and service of the notice; (2) the costs of the court reporter and video link; (3) the attorneys' fees and costs associated with preparing for and taking the deposition of PHS's inadequately prepared [Rule] 30(b)(6) witness; and (4) the costs and attorneys' fees associated with filing, preparing and arguing this Motion.

*Id.*

PHS opposes Defendants' Motion. It concedes that its corporate designee, Meredith Hope Branch, "had apparent difficulty responding appropriately to inquiries posed by Defense counsel" during the Rule 30(b)(6) deposition. *Id.* at 1. Nonetheless, PHS argues that sanctions are unwarranted because PHS's counsel prepared Branch for the deposition. *Id.* In support of this contention, PHS offers a declaration signed by Esperanza Segarra, PHS's former counsel.[5] *See* Pl.'s Opp'n Br. Ex. 1, Decl. of Att'y E. Segarra (Mar. 4, 2021), ECF No. 121-1. In her declaration, Segarra avers that she "held a video conference" with Branch on February 19, 2021 "to prepare her for the deposition." *Id.* ¶ 4. Segarra explains that she and Branch "went through detailed questions from an outline that [Segarra] prepared, the topic areas that were delineated in the Rule 30(b)(6) deposition notice, documents relevant to the subject matter of the deposition, including the Rule 30(b)(6) deposition notice, [and] the subject agreements of Defendant[s]

---

[5] Segarra was counsel of record for PHS throughout much of the relevant period. She filed a motion to withdraw as counsel for PHS in mid-February, and the Court granted her request on February 22, 2021. *See* Order of Feb. 22, 2021, ECF No. 106; *see also* Att'y Segarra's Unopposed Mot. to Withdraw as Counsel, ECF No. 102; Mot. for Recons. of Ct.'s Order Den. Att'y Segarra's Mot. to Withdraw as Counsel, ECF No. 104.

Raven Stephens and Brian Ventura that are attached to the Complaint in this action." *Id.* ¶ 5.
Segarra explains that she also "spent multiple hours" preparing for the deposition and
communicated with Branch to answer Branch's questions. *Id.* ¶¶ 5–7.

PHS argues that it cured the deficiencies in Branch's testimony by offering its President,
Steven Murphy, as an alternative Rule 30(b)(6) designee after Branch's deposition. Pl.'s Opp'n
Br. 1, 10–11. PHS also rejects Defendants' contentions that it has failed to cooperate in
discovery. PHS contends that it has provided information relevant to the seventeen deposition
topics through written discovery and/or through Murphy's deposition. *See id.* at 7–18.

A.    *Rule 30(b)(6) imposes a duty upon corporations to prepare their designees to testify*
      *knowledgeably about information known or reasonably available to the corporation*

Rule 30(b)(6) permits a party to "name a *corporation* as a deponent, in either a notice of
deposition or a subpoena." *Rosenruist-Gestao E Servicos LDA v. Virgin Enters. Ltd.*, 511 F.3d
437, 444 (4th Cir. 2007). But a corporation, of course, cannot literally speak for itself. *In re
Vitamins Antitrust Litig.*, 216 F.R.D. 168, 173 (D.D.C. 2003) ("The corporation as a fictional
entity can never know that a fact is true except to the extent its employee or agent does."").
Therefore, Rule 30(b)(6) permits a party to obtain the corporation's positions through testimony
from a corporate designee, who is required to testify to the corporation's collective knowledge
and whose testimony is binding upon the corporation. *See United States v. Taylor*, 166 F.R.D.
356, 360–61 (M.D.N.C. 1996); *In re Vitamins Antitrust Litig.*, 216 F.R.D. at 173. Adopted in
1970, Rule 30(b)(6) imposes obligations on the parties that "differ[] in significant respects from
the normal [Rule 30(b)(1)] deposition." 8A Charles Wright & Arthur Miller, *Federal Practice &
Procedure* § 2103 (3d ed. 2020). First, it obliges the deposing party to "describe with
particularity the matters for examination." Fed. R. Civ. P. 30(b)(6). Second, it puts the onus on
the corporation, rather than on the party conducting the deposition, to identify the individual(s)

13

who "must testify about information known or reasonably available to the organization." *Id.*

(requiring the corporation to designate "one or more" individuals who "consent to testify on its

behalf"); *see also* Fed. R. Civ. P. 30(b)(6) advisory committee's note to 1970 amendment;

*Rosenruist-Gestao*, 511 F.3d at 445. This approach was intended to "curb the 'bandying' by

which officers or managing agents of a corporation are deposed in turn but each disclaims

knowledge of facts that are clearly known to persons in the organization and thereby to it." Fed.

R. Civ. P 30(b)(6) advisory committee's note to 1970 amendment (quoting *Haney v. Woodward*

*& Lothrop, Inc.*, 330 F.2d 940, 944 (4th Cir. 1964) (coining the term "bandying" to describe

organization's evasive discovery responses and failure to produce an individual "with the

requisite knowledge" to testify)).

A corporation served with a Rule 30(b)(6) deposition notice must adequately prepare its

designee(s) to testify regarding the noticed deposition topics. Unlike a Rule 30(b)(1) deponent

who testifies in his or her personal capacity, a Rule 30(b)(6) designee "speak[s] for the

corporation." *Taylor*, 166 F.R.D. at 361; *see also Rosenruist-Gestao*, 511 F.3d at 445

("Essentially, [i]n a Rule 30(b)(6) deposition, there is no distinction between the corporate

representative and the corporation.") (alteration in original) (internal quotation marks omitted). A

corporate designee is "not expected to be a corporate encyclopedia," able to answer anything and

everything about the company. *Runnels v. Norcold, Inc.*, No. 1:16cv713, 2017 WL 3026915, at

*1 (E.D. Va. Mar. 30, 2017). But she is required to be "reasonably and adequately prepared to

answer questions about the relevant deposition topics." *Id.* She must therefore prepare to testify

beyond her own personal knowledge to matters known to the corporation as a whole. Doing so

may require extensive preparation, document review, interviews, and other forms of

investigation to reasonably identify the corporation's relevant knowledge and positions and

educate the corporate designee on the same. *Taylor*, 166 F.R.D. at 361–62. Indeed, "a

corporation is expected to *create* an appropriate witness or witnesses from information

reasonably available to it if necessary." *Scott Hutchison Enters.*, 318 F.R.D. at 54 (quoting *QBE*

*Ins. Corp. v. Jorda Enters., Inc.*, 277 F.R.D. 676, 689 (S.D. Fla. 2012)); *see also Int'l Ass'n of*

*Machinists & Aerospace Workers v. Werner-Masuda*, 390 F. Supp. 2d 479, 487 (D. Md. 2005)

(explaining that when a corporate designee lacks personal knowledge of the noticed deposition

topics, "the corporation is obligated to prepare [her] so that [she] may give knowledgeable and

binding answers for the corporation"). And although "preparing for a Rule 30(b)(6) deposition

can be burdensome," that is "merely the result of the concomitant obligation from the privilege

of being able to use the corporate form in order to conduct busines." *Taylor*, 166 F.R.D. at 361.

B.      *PHS wholly failed to adequately prepare its Rule 30(b)(6) designee for deposition*

Branch could not and did not testify adequately on PHS's behalf. First, she did not appear

to fully appreciate the fact that she had been designated to testify to PHS's position on all

seventeen deposition topics. She initially stated that she had been designated to testify on only

"some" of them. Rule 30(b)(6) Dep. Tr. 12 (explaining that she could not testify on information

technology matters because she was "not in the IT department"). And although Branch initially

stated that she understood her role as a Rule 30(b)(6) deponent meant that her testimony would

"bind the company as if [her] answers [were] the company's own," *see id.* at 13, her later

responses belie that assertion. At one point, Branch testified that she could not answer defense

counsel's questions because she was "not an officer of the company." *Id.* at 65. When asked

what she meant by that, she elaborated:

A.      Well, if you want me to answer as from Power Homes' view, I cannot do
        that. I can only answer from my view.
Q.      So no one spoke to you today about -- before coming here today about the
        need to be able to answer these questions on behalf of the company?

> A.    No.
> Q.    Why did you think you were coming here today?
> A.    I was told I had to be a part of a deposition, so that's why I'm on the phone.

*Id.* at 65–66. In short, Branch's testimony shows that she simply did not understand that she had

been tasked with "present[ing] the corporation's position" on each of the seventeen deposition

topics. *Taylor*, 166 F.R.D. at 361 (internal quotation marks omitted).

Second, Branch was entirely unprepared to testify. She had never met Stephens or

Ventura, and she had "no direct knowledge" about whether "any non-compete[] [agreements]

were or were not signed by [PHS] employees in 2018 or 2019."[6] *Id.* at 13–14. Moreover,

although Branch had received Defendants' Rule 30(b)(6) notice in advance of the deposition, *id.*

at 12, she did little to prepare to testify on the topics listed therein. At some point during the

litigation, she had "pull[ed]" employee files for Stephens, Ventura, Parrish, and Schram. *Id.* at

14–15. But she had not actually reviewed them in "weeks" and could not testify as to their

contents:

> Q.    So you looked at four files to prepare for this deposition, correct?
> A.    Not in the last recent weeks, no, I have not.
> Q.    Ms. Branch, I thought you said earlier, testified earlier that you learned
>        about this deposition only seven to ten days ago?
> A.    Well, yes, I was informed of the deposition, but I haven't looked at any
>        other paperwork. I was informed via e-mail.
> Q.    And you prepared for the deposition after being informed that it was going
>        to take place?
> A.    I had a conversation with the lawyers and that is it.
> Q.    So you didn't look at the employee files to prepare for this deposition?
> A.    Not recently, no. I said I have pulled the files and sent them over.

---

[6] A Rule 30(b)(6) corporate representative need not necessarily possess personal knowledge of the
deposition topics. *See Taylor*, 166 F.R.D. at 361 ("If the persons designated by the corporation do not
possess personal knowledge of the matters set out in the deposition notice, the corporation is obligated to
prepare the designees so that they may give knowledgeable and binding answers for the corporation.").
Coupled with her complete lack of preparation for the deposition, Branch's lack of any personal
knowledge about the basic subject matter of this lawsuit or the individuals involved highlights the extent
of her inability to testify on behalf of PHS. Indeed, given Branch's complete lack of personal knowledge
and PHS's failure to prepare her in any way, I question why PHS thought it appropriate to designate her
as its corporate representative in the first place.

> Q.     Sent them over to your lawyers?
> A.     Correct.
> Q.     But you didn't look at them.
> A.     I would have to go back and look at them now. If you have copies of everything I sent, I'd be happy to look at it.

*Id.* at 29–30; *see also id.* at 36–37 (explaining that she did not recall when she pulled the four employment files and estimating that it had been "[s]everal weeks" since she had pulled Stephens's file). Other than speak with PHS's counsel to review "sample questions," *id.* at 14, Branch admitted that she did nothing to prepare to testify, *id.* at 15–16, 28–30, 39.

Indeed, Branch knew essentially nothing about Ventura's employment documents. *See id.* at 17–31; *see also* Rule 30(b)(6) Dep. Notice 6. Defense counsel's attempt to question her about them was futile and revealed the extent of her unpreparedness:

> Q.     Okay. We're showing the witness Defense Exhibit 2. Miss Branch, do you agree with me that this appears to be a copy of the Brian Ventura Sales Commission Agreement?
> A.     Correct.
> [. . .]
> Q.     There's a provision in the middle of page 3, it's in bold and it's entitled Confidentiality and Non-Disclosure. Do you see that paragraph?
> A.     Yes.
> Q.     Okay [. . .] You agree to abide by the attached Employee Confidentiality and Non-Disclosure/Non-Solicitation Agreement, which you will be required to sign before starting your employment with the company. Did I read that correctly?
> A.     Yes.
> Q.     Okay. Do you see it says the word "attached" there, correct?
> A.     Correct.
> [. . .]
> Q.     Do you see that Confidentiality and Non-Disclosure Agreement attached to this document?
> A.     I do not see anything attached to the document.
> Q.     Do you know why there was no attachment?
> A.     I do not.
> Q.     Do you know if there was an attachment?
> A.     I do not.
> Q.     And when I say you, I'm asking does Power Home Solar know if there was an attachment?
> A.     No, I don't know.

Q. Okay. Why is it that Power Home Solar doesn't know why there wasn't an attachment to this agreement?

A. I would not know.

Q. Was it routine in August of 2018 to provide a copy of the Sales Commission Agreement to prospective employees without attaching a Confidentiality and Non-Disclosure Agreement?

A. I do not know.

Q. Who would know?

A. Whoever would have been here in 2018.

Q. Do you know who those individuals were?

[. . .]

A. What date, what part of 2018? Sorry.

Q. Oh, August of 2018.

A. I am not sure 100 percent who the manager, HR manager would have been at that point. I know Marilynne Mancuso came on late in 2018, so I'm not sure who it was prior to that.

Q. Does Power Home Solar have a record of who employees were in August of 2018?

A. We have employee files, correct.

Q. So I refer you to an exhibit, Defense Exhibit 1, Topic 16 says the identification of employees in Power Homes' human resources department from January 1, 2018 to present, including the duration of each such employee tenure. Do you see that at paragraph 16 in the topics for this deposition?

A. Sorry. Let me get to that. 16. Yes.

Q. So is there a reason that Power Home Solar was not able to provide information responsive to that topic?

A. I can pull a report and look and see who it says. Like I said, I do not know off the top of my head, no.

[. . .]

Q. [. . .] What is Power Home Solar's official position on whether Brian Ventura signed the Employee Confidentiality and Non-Disclosure/Non-Solicitation agreement?

[. . .]

A. I do not know.

Q. So the company doesn't have a -- so the company does not have a position on whether he signed it?

A. I do not know if the company has a stance.

Rule 30(b)(6) Dep. Tr. 17–25. Relatedly, Branch could only guess that a document titled

"Employee Confidentiality and Non-Disclosure/Non-Solicitation Agreement" must have existed

in August 2018, *id.* at 26, did not know what documents were in Ventura's employment file, *id.*

at 30–31, and could only "assume" that if his documents were not stored in Paycor, then an HR

18

employee must have failed to upload them into the system, *id.* at 18–19. She also did not know

whether PHS was contending that Ventura executed an RCIAA (like Stephens's) in April 2019,

*id.* at 30, and she could only "assume" that someone at PHS must have "track[ed] who signed

certain employment policies and who did not," *id.* at 33.

Branch also knew essentially nothing about Stephens's employment documents. She

acknowledged that, like Ventura's, Stephens's SCA referenced an "Employee Confidentiality

and Non-Disclosure/Non-Solicitation Agreement." *Id.* at 35–38. Branch also agreed that no such

agreement was attached to Stephens's SCA. *Id.* at 38. She did not know why it was not attached

because she "was not [at PHS] in 2018," and she had not spoken to any current or former

employees to try to obtain that information. *Id.* at 38–39. She was also unaware of PHS's

position on whether Stephens had ever signed the purportedly attached "Employee

Confidentiality and Non-Disclosure/Non-Solicitation Agreement":

> Q.     So you don't -- so Power Home Solar has no position on whether Raven Stephens
>        signed the attached document?
> A.     I do not have any position on that. I cannot speak for Power Home Solar about
>        that because I was not here.

*Id.* at 41. Branch was similarly unable to testify regarding Stephens's RCIAA. She

acknowledged that the document appeared to bear Stephens's electronic signature, created on

April 1, 2019 at 7:41 pm, in the bottom left corner of each page. *Id.* at 47–48. But she knew

nothing else about whether and how Stephens had, in fact, signed the document.[7] She also knew

---

[7] In fact, the only thing Branch purported to "know . . . to be true" about Stephens's RCIAA turned out to
be inaccurate. *See* Rule 30(b)(6) Dep. Tr. 48–50. Defense counsel asked Branch whether she could
explain why various fields on Stephens's RCIAA, including the employee name and hire date, were
blank. *See id.* at 48. She explained that Paycor never filled in those fields because it had not been "set to
populate" them with employee information. *Id.* at 49–50. But defense counsel then showed Branch
another employee's RCIAA, dated only days before Stephens's, that had the same fields filled in. *See id.*
at 50–52. Branch acknowledged that the document appeared to have been electronically signed in Paycor
and conceded that her assumption that Paycor "never" populated those fields was "inaccurate." *Id.* at 52.

nothing about whether PHS had attempted to have employees electronically sign RCIAAs in April 2019, *id.* at 44, was not aware of whether former employees other than Stephens and Ventura were "claiming they did not sign a non-compete [agreement] that [PHS] said that they did," *id.* at 58–59, and had never reviewed a copy of the Complaint in this case, *id.* at 60.

Indeed, when specifically questioned about each of the seventeen deposition topics, Branch conceded that she was not prepared to testify about a single one.[8] *See id.* at 64–65 (for topic one, she could not testify as to which PHS employees were responsible for obtaining and maintaining employment documents before she began working at PHS in April 2020); *id.* at 65 (for topic two, she could not identify facts supporting the Complaint's allegation that Stephens signed an RCIAA on or about April 1, 2019, because she was "not an officer of the company"); *id.* at 66 (for topic three, she could not explain why Stephens was not asked to execute an RCIAA until months after she commenced employment with PHS because Branch "was not employed at th[at] time"); *id.* at 66–67 (for topic four, she "thought" she was prepared to explain why Stephens's RCIAA was not dated, counter-signed by PHS, or notarized, but she conceded that "apparently [she] was not"); *id.* at 67 (for topic five, she could not explain why Stephens, Parrish, and Schram were not asked to execute RCIAAs (or similar documents) until months after commencing employment, because she "was not employed at th[at] time"); *id.* at 67–68 (for topic six, she could not explain the meaning of the categories of "Activity Type" in PHS's response to Stephens's First Set of Interrogatories because she did not "even know what that topic is"); *id.* at 68 (for topic seven, she could not testify about PHS's support for its allegation that Ventura signed a document similar to the RCIAA on or about August 6, 2018, because she

---

[8] For brevity, I paraphrase the seventeen deposition topics in the following parenthetical explanations. For the full text of each of the deposition topics, see Rule 30(b)(6) Dep. Notice 5–7.

"was not employed at that time"); *id.* (for topic eight, regarding why PHS could not locate

Ventura's non-compete agreement, if it existed, Branch was "not aware why we cannot find it as

I was not here [in 2018]"); *id.* at 68–69 (for topic nine, regarding why the "Employee

Confidentiality and Non-Disclosure/Non-Solicitation Agreement" referenced in Ventura's SCA

was not attached to that document, Branch "was not employed at the time, so [she was] not able

to talk about that"); *id.* at 69 (for topic ten, she could not testify about accusations by other

current or former employees that someone at PHS forged their signatures on non-compete

agreements because she was "not aware" of any such accusations); *id.* at 69–70 (for topics eleven

and twelve, regarding how PHS contends that Parrish and Schram electronically signed RCIAAs

or similar documents, Branch was unable to testify because "[t]hat would relate more to the IT

department"); *id.* at 70 (for topic thirteen, regarding the identification of PHS employees who

had access to current or former employee email accounts/inboxes from January 1, 2018 through

June 30, 2020, Branch could not answer because she "fe[lt] that's an IT department issue"); *id.* at

70–71 (for topic fourteen, Branch was "[n]ot completely" prepared to identify PHS employees

with access to current or former employee Paycor accounts from January 1, 2018, through June

3[0], 2020 and did not identify anyone); *id.* at 71 (for topic fifteen, regarding details on any law

enforcement investigation into PHS or its current or former employees for forgery and/or notary

fraud from August 1, 2018, through the present, Branch was "not aware of that"); *id.* at 71 (for

topic sixteen, requesting identification of employees in PHS's HR department from January 1,

2018, through the present, Branch was unprepared, but said she could "provide the information"

if she could "pull a report"); *id.* at 71 (for topic seventeen, requesting details about a March 2020

online dispute between PHS's executive officers and one of Sigora's executive officers, Branch

"didn't even know that occurred").

In short, Branch's deposition reveals that PHS simply did not meet its Rule 30(b)(6) obligation to "provide and prepare an individual who [could] adequately testify" on the seventeen noticed deposition topics. *Beltran v. Home Depot, Inc.*, No. 7:07cv192, 2007 WL 9810929, at *3 (W.D. Va. Dec. 6, 2007). Branch "was simply unaware of [her] role as a 30(b)(6) corporate designee," and admitted that at least some of "the information sought could have been obtained through investigation, had [s]he done any." *Spicer v. Universal Forest Prods., Inc.*, No. 7:08cv462, 2008 WL 4455854, at *3 (W.D. Va. Oct. 1, 2008); *see, e.g.*, Rule 30(b)(6) Dep. Tr. 65–66, 71. She also conceded that "the only thing [she] did to acquire knowledge about the topics to be covered at the corporate deposition was meet with [PHS's] counsel." *Spicer*, 2008 WL 4455854, at *3; *see, e.g.*, Rule 30(b)(6) Dep. Tr. 14–16, 28–29. And, when specifically asked about each of the seventeen topics noticed for deposition, Branch agreed that she was unable to testify regarding *any* of them. *See* Rule 30(b)(6) Dep. Tr. 64–71. Indeed, she testified that she had never even heard of some of them, *id.* at 68, 71, although she acknowledged receiving the Rule 30(b)(6) notice, *id.* at 12. Thus, PHS's assertions that its counsel prepared Branch for the deposition, *see* Decl. of Att'y E. Segarra ¶¶ 4–7, simply do not hold up against Branch's own testimony. Whatever steps PHS's counsel took to prepare Branch, it is abundantly clear that any such preparation was wholly inadequate to meet PHS's Rule 30(b)(6) obligations. *Cf. Quantachrome Corp. v. Micromeritics Instrument Corp.*, 189 F.R.D. 697, 699 (S.D. Fla. 1999) ("[W]hen producing a corporate representative for deposition, [a corporation's] duty extends beyond the mere act of presenting a human body to speak on the corporation's behalf.").

C.    *PHS's failure to prepare its Rule 30(b)(6) designee follows repeated failures to engage meaningfully in discovery on the issue of potential forgery and fraud on the Court*

Compounding PHS's failure to produce a knowledgeable corporate representative for its Rule 30(b)(6) deposition, PHS's engagement in other facets of the discovery process has also

been deficient. Defendants have raised serious allegations of forgery that, if true, would undercut the very heart of PHS's claims. *See* Mem. Op. of Dec. 16, 2020 1–2, ECF No. 58. Accordingly, in December 2020 Judge Cullen ordered expedited discovery specifically on the issue of whether Defendants had *actually* signed non-compete agreements while employed by PHS. *See id.* at 10–11. As discussed below, five months later, PHS has repeatedly stonewalled Defendants' attempts to obtain information that could prove (or disprove) their assertions of forgery.

PHS argues that even if Branch was unprepared to testify, the Court should not impose Rule 37(d)(1) sanctions because Defendants obtained relevant information on several of their deposition topics through other forms of discovery. *See* Pl.'s Opp'n Br. 7–10. I cannot agree that those other forms of discovery are adequate substitutes. *See Spicer*, 2008 WL 4455854, at *6 ("Providing [the opposing party] with discoverable information through non-30(b)(6) depositions and document production does not excuse [a party's] failure to prepare its corporate designee for the 30(b)(6) deposition.").

First, PHS points to deposition testimony from its President, Steven Murphy. Pl.'s Opp'n Br. 11–17. A party may, under certain circumstances, cure a deficient Rule 30(b)(6) designee by promptly proffering an alternate corporate representative. *See Marker v. Union Fid. Life Ins. Co.*, 125 F.R.D. 121, 126 (M.D.N.C. 1989) ("Even if defendant in good faith thought that [its Rule 30(b)(6) designee] would satisfy the deposition notice, it had a duty to substitute another person once the deficiency of its Rule 30(b)(6) designation became apparent during the course of the deposition."). But here, it is not clear that PHS did, in fact, promptly offer Murphy as an alternate corporate representative.[9] Regardless, Murphy was largely unable to testify on the Rule 30(b)(6)

---

[9] Murphy was scheduled to be (and was) deposed in his personal capacity one day after PHS's Rule 30(b)(6) deposition. The parties agree that, during the Rule 30(b)(6) deposition, PHS's counsel suggested that Murphy could answer some questions that Branch could not. *See* Pl.'s Opp'n Br. 1; Defs.' Reply 16; *see also* Rule 30(b)(6) Dep. Tr. 25, 33. But, Defendants argue that PHS did not specifically offer Murphy

deposition topics. When Murphy was deposed in his personal capacity on February 26, 2021, he *was* able to give much more fulsome testimony than Branch had been able to provide. But on questions related to the topics Defendants had noticed for Rule 30(b)(6) deposition, Murphy had little knowledge, provided vague and evasive answers, and suggested that other PHS employees would be better suited to respond. *See, e.g.*, Murphy Dep. Tr. 26–27, 30–33, 35, 37–39, 47–49, 51–65.

Second, PHS points to its written discovery responses. *See* Pl.'s Opp'n Br. 7–9, 12–17. A party may not simply opt-out of its obligation to produce an adequately prepared corporate representative because it has already provided answers on the same topics through interrogatories or other written discovery. *Marker*, 125 F.R.D. at 126 ("Nothing in the Federal Rules of Civil Procedure gives a party the right to not respond or inadequately respond to a Rule 30(b)(6) deposition notice . . . and elect to supply the answers in [written discovery]. . . . Because of its nature, the deposition process provides a means to obtain more complete information and is, therefore, favored."). And as discussed more fully below, PHS's written discovery responses were vague and inadequate. Defendants specifically requested information on most of the Rule

---

to testify in a Rule 30(b)(6) capacity. *See* Defs.' Reply 16–17. At oral argument on this motion, PHS's counsel conceded as much, stating that, during Branch's deposition, he did not explicitly offer Murphy to testify in a Rule 30(b)(6) capacity. The parties also disputed at oral argument whether, during a meet and confer held before Defendants filed their motion for sanctions, PHS offered Murphy for deposition in a Rule 30(b)(6) capacity. Both parties agree that PHS *did* offer Murphy for Rule 30(b)(6) deposition *after* Defendants' filed their motion for sanctions. *See* Pl.'s Opp'n Br. 1; Defs.' Reply 18. But Defendants contend that this was "neither curative nor reasonable," because it came after the parties had already conducted expert depositions and was only days before the upcoming evidentiary hearing set for March 9–10. Defs.' Reply 18 (explaining that the parties had agreed that "fact witness depositions needed to conclude before taking any expert depositions").

30(b)(6) deposition topics through written discovery,[10] but PHS failed to adequately respond to those requests.[11]

### 1.    *Rule 30(b)(6) topic 1*

Topic one sought "[t]he identification of any and all individuals who are or were responsible for obtaining and maintaining a copy of any signed or executed employment documents, including employment agreements, from employees and/or potential employees from January 1, 2018 through present." Rule 30(b)(6) Dep. Notice 5. Defendants requested this information multiple times in written discovery. PHS listed Paycor as the custodian of certain employment documents, but it did not identify any individuals responsible for obtaining and maintaining its employment documents.[12] Pl.'s Am. Resp. & Objs. to Stephens's First Set of Interrogs. 4, ECF No. 121-4 (Interrogs. 1, 3 & 4); *see also id.* at 7 (Interrog. 8) (providing no response to request to identify all individuals with knowledge of documents PHS's employees have been required to execute since January 1, 2018); Defs.' Reply Ex. 13, Pl.'s Resp. & Objs. to Ventura's Second Set of Reqs. for Produc. 6 (Feb. 1, 2021), ECF No. 122-5 (Req. for Produc.

---

[10] Topic six is somewhat of an exception. This topic asked PHS to define the categories of "Activity Type" identified in PHS's response to Interrogatory 5 of Stephens's First Set of Interrogatories. *See* Rule 30(b)(6) Dep. Notice 6. The record does not reflect that Defendants obtained this information elsewhere, but it also does not show that Defendants asked for this information through written discovery or during Murphy's deposition. For example, Stephens could have requested this information in her Second Set of Interrogatories to PHS. *See generally* Defs.' Mot. for Sanctions Ex. 5, Pl.'s Am. Resp. & Objs. to Def. Stephens's Second Set of Interrogs. (Feb. 12, 2021), ECF 119-5.

[11] PHS did produce some documents in connection with Defendants' requests for production. The Court does not have copies of all such documents, and therefore has not reviewed them to determine whether they provide information responsive to Defendants' requests. Nonetheless, PHS does not point to them in its brief for the assertion that it has provided adequate information relevant to each deposition topic. *See* Pl.'s Opp'n Br. 13–16 (citing only interrogatory responses and/or Murphy's deposition testimony as responsive information produced for deposition topics one, two, four, seven, eight, nine, eleven, twelve, thirteen, fourteen, and sixteen). Where relevant, I list the requests for production pertaining to each of these deposition topics in footnotes in the sub-sections below. *See infra* notes 12, 14, 15, 17, 18, 21.

[12] PHS did produce some documents in connection with Defendants' requests for production on this topic. *See* Defs.' Mot. for Sanctions Ex. 6, Pl.'s Resp. & Objs. to Defs.' First Set of Reqs. for Produc. 5 (Feb. 1, 2021), ECF No. 119-6 (Req. for Produc. 7). *See supra* note 11.

10) (producing no documents in response to request for documents identifying all PHS

employees responsible for furnishing employment documents to new employees); Pl.'s Am.

Resp. & Objs. to Sigora's Corrected Second Set of Interrogs. 3–4, 5–6, ECF No. 121-7

(Interrogs. 1, 6 & 7) (naming Paycor as the entity responsible for obtaining and maintaining

copies of the non-compete agreements attached to the complaint in the North Carolina Action

and declining to name any PHS employees responsible for the same).

PHS apparently contends that Paycor, alone, is responsible for obtaining and maintaining

its employment documents. *See* Pl.'s Opp'n Br. 7–8. But Murphy's testimony undermined this

assertion. He stated that when Ventura began working for PHS, personnel in its HR and sales

management departments would have been responsible for "advising" Ventura to sign some kind

of non-compete agreement. Murphy Dep. Tr. 32–33. Murphy did not, however, identify any

specific employees by name and did not know details on PHS's process for obtaining executed

employment documents. *Id*. Relatedly, Murphy was unaware of PHS's process for updating its

employment documents. When asked why Stephens's RCIAA said "Version 1 – Updated

January 2019" in the bottom right-hand corner of each page, Murphy was unable to answer. *Id.*

at 60. He could not confirm whether an earlier version of the RCIAA existed. *Id.* When asked

who would know, Murphy testified: "Probably the HR director that is no longer with the

company or one or more of our counsels that worked on these documents." *Id.* at 61.

2.    *Rule 30(b)(6) topics 2 & 4*

Topics two and four related to Stephens. They requested "[t]he identification of facts that

support or relate to [PHS's] allegations in Paragraph 29 of the Complaint that '[o]n or about

April 1, 2019, [Defendant] Stephens executed a[n RCIAA]" and "[d]etails regarding why

Stephens's[s] [RCIAA] is not dated on page 1 and neither signed or dated by a representative of

[PHS] on page 5 nor notarized." Rule 30(b)(6) Dep. Notice 6. PHS's responses to Defendants'

requests for this information were evasive and insufficient. For example, in response to

Defendants' requests for similar information through written discovery, PHS stated:

> Stephens was required to electronically sign into a third-party system, Paycor in the
> case of Stephens, whereby she must utilize usernames and passwords specific to
> her account. The employees are provided a temporary username and password at
> the start of their employment, which then is automatically triggered at the
> employee's first sign-in to change the employee's own personal password. As such,
> [PHS] states that the subject document containing Stephens'[s] electronic signature
> exists as a result of her logging remotely into Paycor to electronically sign such
> document, which she did on April 1, 2019. The signed document is then maintained
> in the Paycor system.

Pl.'s Am. Resp. & Objs. to Stephens's First Set of Interrogs. 4, ECF No. 121-4 (Interrog. 1). It is

hardly surprising that Stephens had access to her own Paycor account and therefore *could have*

signed the RCIAA bearing her electronic signature at 7:41 pm on April 1, 2019. But PHS's

response says nothing about why it believes that Stephens *actually* signed the document, or show

that Stephens's electronic signature on the RCIAA was not forged. Similar interrogatories

seeking information about PHS's support for this position produced little additional information.

*See id.* at 4–5 (Interrogs. 2, 3 & 5). And a later request provided no further information, except to

note that PHS was "still currently waiting for records from Sprint which may assist in responding

to this interrogatory."[13] *See* Pl.'s Am. Resp. & Objs. to Def. Stephens's Second Set of Interrogs.

4, ECF 119-5 (Interrog. 2).[14]

Similarly, Murphy provided little information about how and why PHS believes that

Stephens did, in fact, sign her RCIAA on April 1, 2019. He had seen her RCIAA, Murphy Dep.

Tr. 25, 46–47, but he provided few details about it, *see id.* at 47–49. He could not explain why it

was blank in various fields, other than to say that PHS's expert and counsel had told him that the

fields were blank because the document was "electronically signed and stamped at the bottom of

each page." *Id.* at 47–49. He stated that the blanks were there "[i]n case the form was signed

manually by any given employee," but he did not know whether any current or former

employees ever had signed the document manually. *Id.* at 49. Murphy also testified that

Stephens's RCIAA was stored in Paycor and that he had been "advised by [PHS's] expert and . . .

. counsel that [the IP address on Stephens's RCIAA] tracked back to Raven Stephens'[s] Paycor

account." *Id.* at 51. Murphy also testified briefly regarding Stephens's SCA. *Id.* at 42–44. He

agreed that it was substantively identical to Ventura's SCA, and acknowledged that, like

---

[13] On January 18, 2021, PHS served a third-party subpoena upon Sprint Corporation. *See* Pl.'s Unopposed Mot. to Compel 1, ECF No. 100. PHS sought, among other things, information regarding the IP address listed on Stephens's RCIAA. *Id.* PHS asserts that it "tirelessly sought" documents from Sprint and produced them to Defendants "voluntarily . . . within three business days of receipt." Pl.'s Opp'n Br. 9. Defendants argue that PHS did not promptly produce the documents it received from Sprint, characterizing this as another stall tactic that impaired their ability to prepare for the Court's evidentiary hearing. *See* Defs.' Mot. for Sanctions 18 (explaining that PHS received the Sprint records on February 24 and did not "disclose their existence or otherwise produce them to Defendants until the afternoon of March 1, 2021—having withheld them until after the [Rule] 30(b)(6) deposition ended and until the eve of PHS's expert deposition"); *see also* Defs.' Reply 24 (arguing that PHS's delay in disclosing the Sprint records "precluded Defendants from asking about them during the [Rule] 30(b)(6) deposition and effectively limiting Defendants['] and their experts' ability to study them and prepare for PHS's expert's deposition").

[14] PHS did produce some documents in connection with Defendants' requests for production on these topics. *See* Defs.' Reply Ex. 12, Pl.'s Resp. & Objs. to Sigora's First Set of Reqs. for Produc. 4, 9 (Feb. 1, 2021), ECF No. 122-4 (Reqs. for Produc. 2, 3 & 15); Pl.'s Resp. & Objs. to Defs.' First Set of Reqs. for Produc. 5, 9, ECF No. 119-6 (Reqs. for Produc. 4 & 19); Pl.'s Resp. & Objs. to Ventura's Second Set of Reqs. for Produc. 6, ECF No. 122-5 (Reqs. for Produc. 11 & 12). *See supra* note 11.

Ventura's, it referenced an "attached" "Employee Confidentiality and Non-Disclosure/Non-Solicitation Agreement" that was not actually attached. *Id.*

### 3.     *Rule 30(b)(6) topics 3 & 5*

Topics three and five sought "[d]etails regarding why Stephens was not asked to execute the [RCIAA] until months after she commenced employment at [PHS]" and "[d]etails regarding why Stephens, Ben Parrish, and Harris Parker Schram were not asked to execute documents similar to the [RCIAA] until months after they commenced employment at [PHS]." Rule 30(b)(6) Dep. Notice 6. Defendants requested this exact information through their interrogatories. *See* Pl.'s Am. Resp. & Objs. to Sigora's Corrected Second Set of Interrogs. 4, ECF No. 121-7 (Interrogs. 2 & 3). PHS responded that it "updated certain documents, including the subject agreement" in its "normal course of business . . . [o]n or about April 1, 2019." *Id.* "Employees that executed the updated agreement, including Raven Stephens, were provided a $50.00 bonus as consideration." *Id.* While this information may be accurate, it did not provide any insight into why Stephens, Parrish, and Schram were asked to sign non-compete agreements after they began working for PHS rather than when their employment began.

### 4.     *Rule 30(b)(6) topics 7–9*

Topics seven through nine related to Ventura. They requested "[a]ll facts that support or relate to [PHS's] allegations in Paragraph 36 of the Complaint that 'in the ordinary course of his employment with PHS Defendant Ventura signed a[n agreement similar to the RCIAA] with PHS when he was employed by PHS on or about August 6, 2018,'" "[d]etails around why the Ventura agreement cannot be found," and "[i]nformation surrounding why the 'EMPLOYEE CONFIDENTIALITY AND NON-DISCLOSURE/NON-SOLICITATION AGREEMENT' referenced on page 3 of Exhibit C to the Complaint was not attached to the Sales Commission

Agreement." Rule 30(b)(6) Dep. Notice 6. In his interrogatories, Ventura asked PHS to identify

with particularity all facts supporting PHS's allegation that he signed a non-compete agreement

on or about August 6, 2018. *See* Defs.' Mot. for Sanctions Ex. 4, Pl.'s Resp. & Objs. to

Ventura's First Set of Interrogs. 4, 5 (Feb. 1, 2021), ECF No. 119-4 (Interrogs. 1 & 5). PHS

claims that it responded adequately to such requests, *see* Pl.'s Opp'n Br. 8, but review of PHS's

responses shows they were vague and provided no substantive information about why PHS

contends that Ventura *actually* signed a non-compete agreement, as it alleged in its Complaint:

> [PHS] states that each PHS employee, including Ventura, is required to sign an
> employment agreement similar in form and/or substance as the [RCIAA] as (sic)
> Defendant Stephens signed, which would contain a Confidentiality and Non-
> Disclosure provision as is specifically referenced in the [SCA] that Ventura signed
> and attached as Exhibit C to the Complaint. Thus, Ventura was aware of the duties
> of confidentiality and non-disclosure contained in said employment agreements.

Pl.'s Resp. & Objs. to Ventura's First Set of Interrogs. 4, ECF No. 119-4 (Interrog. 1). Quite

simply, this response does nothing to explain why PHS alleged in its Complaint that Ventura

*actually* signed a non-compete agreement with PHS. *See* Compl. ¶ 36. PHS gave a similarly

perfunctory response to Ventura's request for information about why his non-compete

agreement, if it existed, could not be found. Pl.'s Resp. & Objs. to Ventura's First Set of

Interrogs. 5, ECF No. 119-4 (Interrog. 5) (objecting and responding only that PHS was unable to

find Ventura's alleged non-compete agreement because it was not stored in Paycor or in PHS's

employee files). And, when asked to explain why the "Employee Confidentiality and Non-

Disclosure/Non-Solicitation Agreement" referenced in Ventura's SCA was not attached thereto,

PHS provided no substantive response and merely referred Ventura to its responses to his first

and fifth interrogatories, which also did not answer the question. *Id.* (Interrog. 6); *see also id.* at 4, 5 (Interrogs. 1 & 5).[15]

Similarly, Murphy could not provide much substantive information about PHS's basis for alleging that Ventura *actually* signed a non-compete agreement while at PHS. He had not seen Ventura's purported non-compete agreement. Murphy Dep. Tr. 25. Instead, he had been told that PHS was "not able to find the actual document yet but had documented the process that [PHS] had used to have those agreements signed." *Id.* Murphy testified that he did not know why Ventura's signed copy of the "Employee Confidentiality and Non-Solicitation/Non-Disclosure Agreement" could not be found. [16] *Id.* at 31 (explaining that he had been advised by counsel that "they were still looking for it"). He had simply been advised that, as of the date of his deposition, it could not be found. *Id.* at 39–40. He explained that individuals in PHS's HR and sales management departments would have been advising Ventura to sign the agreement when Ventura began working for PHS, but he could not explain in any greater detail the process by which PHS obtained signed employment documents. *Id.* at 32–33, 37–38. Murphy was also under the impression that Ventura had "signed an electronic non-compete [agreement] on or around April 1, 2019 through Paycor" and did not know why it was not stored in Paycor. *Id.* at

---

[15] PHS did produce some documents in connection with Defendants' requests for production on these topics. *See* Pl.'s Resp. & Objs. to Sigora's First Set of Reqs. for Produc. 5, ECF No. 122-4 (Reqs. for Produc. 4 & 5); Pl.'s Resp. & Objs. to Defs.' First Set of Reqs. for Produc. 4, 9, ECF No. 119-6 (Reqs. for Produc. 2 & 19); Pl.'s Resp. & Objs. to Ventura's Second Set of Reqs. for Produc. 6, ECF No. 122-5 (Reqs. for Produc. 11 & 12). *See supra* note 11.

[16] Murphy gave conflicting testimony on whether he believed the "Employee Confidentiality and Non-Solicitation/Non-Disclosure Agreement" referenced in Ventura's and Stephens's SCAs existed. He initially testified that he had never seen a copy of it, signed or blank. Murphy Dep. Tr. at 30–31. Later, he testified that the document "did actually exist" and that "[t]o the best of [his] recollection," he had seen a copy of it. *Id.* at 44. He could not provide any further details about it. *Id.* at 44–45.

26–27; *see also id.* at 52–53 (testifying that Ventura's RCIAA, if it existed, also could not be found and that there was "no good answer as to why it does not reside in Paycor").

5.    *Rule 30(b)(6) topic 10*

Topic ten sought "[a]ll accusations known to [PHS] of current or former employees stating that someone at [PHS] forged their signatures (wet or electronic) on purported employment agreements with non-competes, the names of those complaining former employees, and the approximate dates of the complaints." Rule 30(b)(6) Dep. Notice 7. Defendants specifically requested this information through interrogatories, but PHS provided no information. It simply directed Defendants to its response to an interrogatory on an entirely different topic, which in turn directed Defendants to a third interrogatory—on the same entirely different topic— to which PHS had provided no substantive response. Pl.'s Resp. & Objs. to Ventura's First Set of Interrogs. 4, 6, ECF No. 119-4 (Interrogs. 2, 3 & 7); *see also id.* at 6 (Interrog. 8).

Murphy acknowledged hearing that Parrish and Schram were also alleging that their non-compete agreements were forged, but he had not reviewed their allegations recently and did not provide much information about them. *See* Murphy Dep. Tr. 53–54, 57. He testified that PHS had "hired an outside expert to review the electronic documentation trail to provide as much evidence as was available" regarding the allegations of potential forgeries, but he did not know specifics of the expert's investigation and whether it related to Parrish and Schram. *Id.* at 54 ("You'd have to ask the expert and our counsel what all areas they looked at internally on the document -- on the electronic records. That's not my area of expertise."); *see also id.* at 55–56 (deferring to Don Thein, PHS's IT director, for information on PHS's internal investigation into the allegations of forgery raised in both the instant action and the North Carolina Action).

6.    *Rule 30(b)(6) topics 11–12*

32

Topics eleven and twelve asked for information about how or why PHS "contends" that
Parrish and Schram each "executed a document similar to the [RCIAA], including which
device[s] [they each] used, [the devices'] geolocation[s], and how [the devices] connected to the
internet." Rule 30(b)(6) Dep. Notice 7. Defendants' written requests repeatedly inquired about
Parrish and Schram's allegations, in the North Carolina Action, that PHS forged their non-
compete agreements. But PHS objected and refused to provide any substantive responses to these
requests. *See* Pl.'s Resp. & Objs. to Ventura's Second Set of Reqs. for Produc. 6, ECF No. 122-5
(Reqs. for Produc. 11 & 12) (producing documents relevant to Stephens and Ventura only); Pl.'s
Am. Resp. & Objs. to Sigora's Corrected Second Set of Interrogs. 6–7, ECF No. 121-7
(Interrogs. 8 & 9) (declining to explain how PHS contends that Parrish and Schram *actually*
signed the RCIAAs they contest were forged, but stating that "any document[s] containing [their]
electronic signature[s] would as exist as a result of [their] logging into Paycor to sign such
document[s]"); *id.* at 5 (Interrog. 5); Pl.'s Resp. & Objs. to Defs.' First Set of Reqs. for Produc.
4–5, ECF No. 119-6 (Reqs. for Produc. 3 & 4) (declining to produce a copy of Schram's RCIAA,
and declining to produce documents that PHS asserts prove that Parrish and Schram actually
signed their RCIAAs). Similarly, an interrogatory asking PHS to identify all facts Murphy relied
upon in verifying the North Carolina Action complaint was met with the perfunctory, boilerplate
response that Murphy "relied upon facts as set forth in the allegations in the Complaint . . . and
the exhibits attached thereto." *See* Pl.'s Am. Resp. & Objs. to Stephens's First Set of Interrogs.
10, ECF No. 121-4 (Interrog. 16).[17]

    7.    *Rule 30(b)(6) topics 13–14*

---

[17] PHS did produce some documents in connection with Defendants' requests for production on these
topics. *See* Pl.'s Resp. & Objs. to Sigora's First Set of Reqs. for Produc. 8–9, ECF No. 122-4 (Reqs. for
Produc. 14 & 16). *See supra* note 11.

Topics thirteen and fourteen asked PHS to identify "employees who had access to current or former [PHS] employee e-mail accounts/inboxes from January 1, 2018 through June 3[0], 2020, and information related to such access" and "employees who had access to current or former [PHS] employee Paycor accounts from January 1, 2018 through June 3[0], 2020." Rule 30(b)(6) Dep. Notice 7. Defendants also requested this information through interrogatories. *See* Pl.'s Opp'n Br. Ex. 8, Pl.'s Am. Resp. & Objs. to Def. Ventura's Second Set of Interrogs. 4–5 (Feb. 12, 2021), ECF No. 121-8 (Interrogs. 2 & 3). PHS responded to the interrogatories by explaining that each employee has access to his or her own work email and his or her own Paycor account, that employees create and maintain their own passwords to these accounts, and that "PHS employees did not have access to any employee's Paycor accounts other than their own." *Id.* This response provided no insight into the whether anyone at PHS, such as an administrator, IT professional, or HR professional, had any ability to access or modify documents on employees' email and/or Paycor accounts, such that they could have had the ability to forge the non-compete agreements at issue.[18]

Again, Murphy could not knowledgably respond to questions on these topics. He did not know whether employees in PHS's IT department in April 2019 "would have had access to employee e-mail inbox accounts" and stated that Don Thein, PHS's IT director, would have such information. Murphy Dep. Tr. 62. He also did not know specifics about PHS's password protocols for third-party platforms like Paycor and did not know what administrative privileges PHS's HR department would have had to Paycor in April 2019. *Id.* at 63–65.

---

[18] PHS did produce some documents in connection with Defendants' requests for production on these topics. *See* Pl.'s Resp. & Objs. to Sigora's First Set of Reqs. for Produc. 8–9, ECF No. 122-4 (Reqs. for Produc. 14, 15 & 16); Pl.'s Resp. & Objs. to Defs.' First Set of Reqs. for Produc. 5, ECF No. 119-6 (Req. for Produc. 6); Pl.'s Resp. & Objs. to Ventura's Second Set of Reqs. for Produc. 7, ECF No. 122-5 (Reqs. for Produc. 14 & 15). *See supra* note 11.

8.    *Rule 30(b)(6) topic 15*

Topic fifteen sought "[d]etails surrounding the subject of any law enforcement

investigation into [PHS] or its current or former employees for forgery and/or notary fraud,

[from] August 1, 2018, to present." Rule 30(b)(6) Dep. Notice 7. Defendants repeatedly sought

such information through written discovery. PHS objected and provided no substantive

information regarding any law enforcement investigations into PHS or its current or former

employees for forgery and/or notary fraud. *See* Pl.'s Am. Resp. & Objs. to Stephens's First Set

of Interrogs. 7–9, ECF No. 121-4 (Interrogs. 10–11, 13–15); Pl.'s Resp. & Objs. to Ventura's

First Set of Interrogs. 6, ECF No. 119-4 (Interrog. 8); Pl.'s Resp. & Objs. to Defs.' First Set of

Reqs. for Produc. 7–8, ECF No. 119-6 (Reqs. for Produc. 12–18); Pl.'s Resp. & Objs. to

Ventura's Second Set of Reqs. for Produc. 4–5, ECF No. 122-5 (Reqs. for Produc. 1–8).

Murphy provided a brief overview of notary fraud allegations involving two current PHS

employees and one former PHS employee, but he did not provide any detailed information on

this topic. *See* Murphy Dep. Tr. 57–59 (providing a general overview of the notary fraud

allegations and then commenting: "[w]e were not involved in this at all, so that's my

understanding of what was occurring when we found out about it").

9.    *Rule 30(b)(6) topic 16*

Topic sixteen sought "[t]he identification of employees in [PHS's] Human Resources

department from January 1, 2018 to present, including the duration of each such employee's

tenure." Rule 30(b)(6) Dep. Notice 7. Branch provided a partial response to this question during

her deposition, identifying Marilynne Mancuso as PHS's former Director of HR and identifying

a few current HR employees.[19] *See* Rule 30(b)(6) Dep. Tr. 9–11. Importantly, however, she

---

[19] Branch identified herself as PHS's Senior HR Manager and identified Joe Cawood as her direct
superior and PHS's current Senior HR Director. Rule 30(b)(6) Dep. Tr. 9–10. She also identified three

could not provide any information on who worked in PHS's HR department in August 2018

when Ventura purportedly signed a non-compete agreement. *Id.* at 22. She claimed that she

could "pull a report" to obtain this information, but she "d[id] not know [it] off the top of [her]

head." *Id.*

Defendants repeatedly requested this information through written discovery, but PHS

failed to provide responsive information. *See* Pl.'s Am. Resp. & Objs. to Stephens's First Set of

Interrogs. 7, ECF No. 121-4 (Interrog. 8); Pl.'s Resp. & Objs. to Ventura's First Set of Interrogs.

4, ECF No. 119-4 (Interrogs. 2–3, seeking information about Vanessa Mason, who counter-

signed Ventura's SCA);[20] Pl.'s Resp. & Objs. to Ventura's Second Set of Reqs. for Produc. 5–6,

ECF No. 122-5 (Req. for Produc. 10).[21]

Murphy likewise could not identify who worked in PHS's HR department in August

2018. He was merely able to identify Joe Cawood as the current Senior Director of HR and

Marilynne Mancuso as PHS's former HR director. *See* Murphy Dep. Tr. 14, 61. He did not know

how to contact Mancuso and could not identify any other individuals who formerly worked in

PHS's HR department. *See id.* at 60–61, 64–65.

### 10.    *Rule 30(b)(6) topic 17*

Topic seventeen requested "[d]etails about the online dispute through social media

between [PHS's] executive officers, including Jayson Waller and Ben Brookhart, and Tad

---

individuals—Angela Rastetter, Mary Rodden, and Deborah Vartanian—who currently work for PHS and
report directly to her. *Id.* at 11. Branch was also able to explain that Marilynne Mancuso was PHS's
former HR director and that Mancuso worked for PHS from November 2018 through October 2020. *Id.* at
9–10, 22, 61–62.

[20] PHS did ultimately provide Mason's contact information "within 24 hours after Defendants stated they
intended to raise with the Court PHS's ongoing refusal to turn over [such] information." Defs.' Reply 8.

[21] PHS produced some documents in connection with Defendants' requests for production on this topic.
*See* Pl.'s Resp. & Objs. to Ventura's Second Set of Reqs. for Produc. 5–6, ECF No. 122-5 (Req. for
Produc. 9). *See supra* note 11.

Luttrell of Sigora Solar, LLC, during March 2020." Rule 30(b)(6) Dep. Notice 7. PHS provided

no information to Defendants' requests for information regarding this topic. *See* Pl.'s Am. Resp.

& Objs. to Sigora's Corrected Second Set of Interrogs. 8, ECF No. 121-7 (Interrog. 14)

(objecting and providing no response); Pl.'s Resp. & Objs. to Ventura's Second Set of Reqs. for

Produc. 7, ECF No. 122-5 (Req. for Produc. 16) (declining to produce copies of all written

comments in the alleged social media dispute).

D.    *PHS's discovery violations warrant significant sanctions*

Defendants ask the Court to impose severe, mostly claim-dispositive, discovery sanctions

upon PHS. After carefully considering the parties' filings and oral arguments and the Court's

options under Rule 37(d), I respectfully recommend that the presiding District Judge grant

Defendants' Motion in part and issue an order (1) barring PHS from supplementing any answers

given during its Rule 30(b)(6) deposition, (2) precluding PHS from offering any evidence to

support its contentions that Stephens and Ventura validly executed non-compete agreements that

PHS had not produced to Defendants before Defendants filed the instant Motion, and (3)

granting in part Defendants' request for attorneys' fees and costs incurred in connection with the

Rule 30(b)(6) deposition and the instant Motion.

"Preclusion of testimony" or other evidence is an "extreme sanction[], to be deployed

only in rare situations. But unless Rule 37 is perceived as a credible deterrent rather than a 'paper

tiger,' . . . the pretrial quagmire threatens to engulf the entire litigative process." *Cine Forty-*

*Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1064 (2d Cir. 1979).

This evidentiary sanction prevents the "'sandbagging' of an opponent" by which a party

"conduct[s] a half-hearted inquiry before the deposition but a thorough and vigorous one before"

presenting its case in court. *Taylor*, 166 F.R.D. at 362. The award of reasonable costs and fees

37

caused by PHS's failure is mandatory unless PHS can show "the failure was substantially

justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(d)(3).

*

As noted, courts apply a four-part test to determine the appropriate sanction under Rule

37(d): "(1) whether the noncomplying party acted in bad faith, (2) the amount of prejudice that

noncompliance caused the adversary, (3) the need for deterrence of the particular sort of non-

compliance, and (4) whether less drastic sanctions would have been effective." *Belk*, 269 F.3d at

348.

First, PHS acted in bad faith when it failed to produce a knowledgeable corporate

representative for its Rule 30(b)(6) deposition. A finding of bad faith is warranted when a party's

actions "demonstrate[] a pattern of indifference and disrespect to the authority of the court," *Mut.

Fed.*, 872 F.2d at 93, or evince "'callous disregard' of the party's obligations under the Rules,"

*Wilson*, 561 F.2d at 504. Mere "inability" to comply does not constitute bad faith. *Id.* at 503; *see

also Bizprolink, LLC v. Am. Online, Inc.*, 140 F. App'x 459, 463 (4th Cir. 2005); *Société

Internationale pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197,

212 (1958). Rather, bad faith is the knowing disregard for a party's obligations to comply with

court orders and/or the Federal Rules of Civil Procedure. *Rabb v. Amatex Corp.*, 769 F.2d 996,

999–1000 (4th Cir. 1985) (adopting Second Circuit's conclusion that "failure to comply 'where

counsel clearly should have understood his duty to the court' constituted professional negligence

amounting to 'fault,'" or bad faith sufficient to warrant dismissal under Rule 37(d) (quoting *Cine

Forty-Second St. Theatre*, 602 F.2d at 1065)); *see also Belk*, 269 F.3d at 348 (finding bad faith

where party failed to supplement its interrogatories and blamed such failure on an unreasonable

interpretation of the district court's order); *Zornes v. Specialty Indus., Inc.*, 166 F.3d 1212

38

(Table), 1998 WL 886997, at *6–7 (4th Cir. 1998) (affirming district court's finding of bad faith where party consistently disregarded discovery deadlines and made affirmative misrepresentations to the court, in "blatant disregard" for the court's order and the federal rules).

PHS fell well short of its Rule 30(b)(6) obligations by failing to prepare its corporate representative to testify knowledgeably. PHS attempted to assure the Court through Segarra's Declaration and other evidence that it satisfied its duty to prepare Branch to testify, despite her inadequate answers. Branch's deposition transcript, however, shows that she was completely unprepared. She could not testify regarding *any* of the seventeen topics noticed for deposition, she testified that she had not prepared aside from speaking with counsel, and she said she had never even heard of some of the deposition topics. In Branch, PHS selected a person to act as its corporate designee who was not employed by PHS during the period at issue and who had no personal knowledge of the events giving rise to this case. Branch's testimony shows that neither PHS nor its counsel took any meaningful steps to even minimally prepare her to testify knowledgeably on behalf of the company, even though she had no personal knowledge about this case. *See Taylor*, 166 F.R.D. at 361. Further, Branch's deposition followed PHS's repeated failure to provide adequate written discovery responses. Judge Cullen ordered expedited discovery into Defendants' allegations of forgery and fraud on the Court because such allegations were susceptible to "being substantiated (or not) through relatively limited discovery and an evidentiary hearing." Mem. Op. of Dec. 16, 2020, at 1–2. But PHS has repeatedly frustrated that process, blocking Defendants' attempts to obtain information necessary to prove (or disprove) their allegations at every step. Accordingly, I am compelled to find that PHS has acted in bad faith. *See Latson v. Clarke*, No. 1:16cv39, 2018 WL 2193145, at *4 (W.D. Va. May 14, 2018) (finding bad faith where Rule 30(b)(6) designees "did nothing more than meet briefly

with counsel" in preparation for corporate deposition and were unprepared to "answer questions that clearly fell within the narrow [designated] topics"); *Weintraub v. Mental Health Auth. of St. Mary's, Inc.*, No. DKC 2008-2669, 2010 WL 347882, at *3 (D. Md. Jan. 22, 2010) (finding bad faith "clearly" evident where corporate representative was completely unprepared to testify and where counsel, knowing that she likely lacked the requisite knowledge, "made little or no effort" to prepare her).

Second, PHS's actions resulted in significant prejudice to Defendants. PHS contends that Defendants obtained information on the noticed deposition topics from written discovery and from Murphy's deposition. *See* Pl.'s Opp'n Br. 7–9, 12–17. But as I have discussed at length, this is simply incorrect. PHS's written discovery responses were woefully inadequate and provided very little information needed to discern whether Stephens's and Ventura's non-compete agreements were forged, or whether Ventura's ever existed. And although Murphy testified more fully than Branch, he was unprepared to testify substantively on the Rule 30(b)(6) topics. Instead, he repeatedly suggested that other individuals would have such knowledge. *See* Murphy Dep. Tr. 54–65. This "bandying" is exactly what Rule 30(b)(6) was designed to protect against. If PHS's current or former sales, HR, and IT department employees, or any other individuals reasonably accessible to PHS have knowledge of the Rule 30(b)(6) topics, they should have been interviewed in advance of PHS's Rule 30(b)(6) deposition and/or designated to testify as PHS's corporate representative(s). *See Loboa v. Women's Health All., P.A.*, No. 5:18cv329, 2020 WL 889739, at *4 (E.D.N.C. Feb. 24, 2020) (finding corporation should have interviewed employees and used other "means reasonably available to" it to prepare for Rule 30(b)(6) deposition); *Weintraub*, 2010 WL 347882, at *4 (finding prejudice where corporation later identified another more-knowledgeable individual whom it should have designated as its

corporate representative "in the first place"); *Taylor*, 166 F.R.D. at 361 (finding that a corporation is not relieved of its obligations under Rule 30(b)(6) merely because it has lost institutional knowledge held by former employees and must prepare for its deposition by means "reasonably available, whether from documents, past employees, or other sources"). These discovery failures have prevented Defendants from obtaining information that is crucial to their allegations of forgery and fraud and have substantially hindered their ability to prepare effectively for the Court's evidentiary hearing. *See Wright*, 1999 WL 507119, at *5 (affirming district court finding of prejudice where party refused to appear for deposition twice and failed to provide adequate written discovery responses, thereby "depriv[ing] the [plaintiff] of the ability to discover material evidence that [the defendant] intended to offer at trial"); *Spicer*, 2008 WL 4455854, at *8 (finding prejudice where moving party incurred expenses in preparing for an "utterly futile" Rule 30(b)(6) deposition, at which it was unable to obtain discoverable information relevant to its claims).

Third, there is a need to deter this "particular sort of non-compliance." *Belk*, 269 F.3d at 348. PHS has repeatedly failed to meaningfully engage in discovery. It cannot be allowed to continue to disregard its obligations under the federal rules or to ignore the Court's orders directing expedited discovery on this issue. At oral argument, PHS's counsel claimed that PHS simply does not have some of the information Defendants seek. He explained, for example, that there were no witnesses to the execution of Stephens's RCIAA because PHS maintains that Stephens logged into Paycor and electronically signed it herself. But "[a] party does not meet its obligations under . . . Rule 30(b)(6) by figuratively throwing up its hands in a gesture of helplessness." *Poole ex rel. Elliott v. Textron, Inc.*, 192 F.R.D. 494, 504 (D. Md. 2000) (internal quotation marks omitted). The record gives no indication that PHS has even tried to discern

answers to some of Defendants' questions. And PHS's assertions that Stephens and Ventura *in fact* signed the underlying non-compete agreements simply because PHS *believes* they signed those agreements are tautological and an abuse of the discovery process. PHS faces serious allegations of forgery and fraud on the Court. It should have welcomed the opportunity to fully rebut those allegations. And even if the evidence tends to prove Defendants' claims, PHS may not simply opt to hide the ball. Fed. R. Civ. P. 26(b)(1); *Wright*, 1999 WL 507119, at *5 ("Parties in civil proceedings must be afforded the opportunity to uncover evidence which could affect the outcome of the case."). The presiding District Judge ordered expedited discovery and an evidentiary hearing to get to the heart of Defendants' allegations of forgery and fraud fairly and efficiently. PHS's discovery misconduct has stymied that process. Sanctions are warranted to ensure that PHS's intransigence does not further disrupt this litigation. *Cf. Mut. Fed.*, 872 F.2d at 94 ("To find otherwise would be to send the opposite message that the court may be pushed, ignored and defied to the outermost limits so long as the noncomplying party has even an inadequate fallback act ready in the wings should the final curtain be falling.").

Fourth, less drastic sanctions are not likely to be effective. Given PHS's repeated failures to produce information responsive to Defendants' discovery requests, it would not be sufficient to merely direct the parties to conduct a new Rule 30(b)(6) deposition. Indeed, PHS takes the position that it has produced adequate information responsive to the noticed deposition topics, *see generally* Pl.'s Opp'n Br. 7–9, 12–17, and has not shown that it would comply meaningfully with a court order to produce (and prepare) a new corporate representative. Moreover, PHS's discovery failures have already caused unreasonable delay and prompted the Court to delay the evidentiary hearing on this matter indefinitely. *See* Order of Mar. 5, 2021.

Accordingly, I recommend limiting the scope of evidence that PHS may present at the evidentiary hearing to the evidence it had produced in discovery as to the seventeen Rule 30(b)(6) deposition topics before Defendants filed this motion. PHS should not be permitted to supplement its Rule 30(b)(6) responses or to present any evidence on the seventeen deposition topics that it did not produce to Defendants before they filed their motion for sanctions on March 4, 2021, to defend against Defendants' allegations of forgery and fraud on the Court. I also recommend granting Defendants' request for reasonable attorneys' fees in part. I recommend denying Defendants' request for fees related to the preparation of the Rule 30(b)(6) notice because PHS's failures in the deposition did not affect the preparation of the notice.  Defendants shall file a petition for attorneys' fees within thirty days from entry of Judge Cullen's order on this Report & Recommendation. I decline to recommend the extreme sanctions of dismissal or default judgment at this early stage of litigation. But, I recommend warning PHS that further discovery violations could warrant such measures. *Zornes*, 1998 WL 886997, at *5 (noting that district courts "must give a party a 'clear and explicit' warning" before imposing the severe sanctions of dismissal or default judgment) (quoting *Choice Hotels Int'l v. Goodwin & Boone*, 11 F.3d 469, 472 (4th Cir. 1993)).

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge GRANT in part and DENY in part Defendants' Motion for Claim-Terminating Sanctions, ECF Nos. 115, 119. Specifically, I recommend that the presiding District Judge:

(1) GRANT Defendants' request for an Order barring PHS from supplementing the answers given during PHS's Rule 30(b)(6) deposition on February 25, 2021;

43

(2) ENTER an Order precluding PHS from offering any evidence not produced to Defendants before Defendants filed the instant Motion on March 4, 2021, to support its contentions that Stephens and Ventura validly executed non-compete agreements;

(3) GRANT Defendants' request for reasonable attorneys' fees and costs for (a) the costs of the court reporter and video link, (b) the attorneys' fees and costs associated with preparing for and taking the deposition of PHS's inadequately prepared Rule 30(b)(6) witness, and (c) the attorneys' fees and costs associated with the filing, preparing, and arguing of this Motion, but DENY Defendants' request for the attorneys' fees and costs associated with the preparation and service of the Rule 30(b)(6) deposition notice;

(4) DIRECT Defendants to file a petition for attorneys' fees and costs within thirty days from the entry of the presiding District Judge's Order on this Report & Recommendation;

(5) DENY Defendants' request for an Order directing that the allegations of forgery of Ventura's and Stephens's purported non-compete agreements be conclusively established;

(6) DENY Defendants' request for an Order striking PHS's Complaint and affirmative defenses to Defendants' Counterclaims, or in the alternative, entering default judgment on their claims and on Defendants' Counterclaims.

**Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or

specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: May 20, 2021

Joel C. Hoppe
United States Magistrate Judge