UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| POWER HOME SOLAR, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:20-cv-00042 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| SIGORA SOLAR, LLC, *et al.*, | ) | By:    Hon. Thomas T. Cullen |
| | ) | United States District Judge |
| Defendants. | ) | |

After Defendants Sigora Solar, LLC, Raven Stephens, and Brian Ventura (collectively, "Defendants") raised credible allegations that Plaintiff Power Home Solar, LLC ("PHS") filed this lawsuit based on forged and/or nonexistent noncompete agreements, the court held the parties' two pending motions to dismiss in abeyance and ordered discovery into this narrow issue.

At the evidentiary hearing on this matter, the parties introduced conflicting evidence. Eight former PHS employees testified that PHS had forged their signatures on various documents—both on paper and electronically. Two of those employees credibly testified that their signatures appeared on a document *after* PHS terminated their employment. Further, counsel for PHS and its president, Steve Murphy, admitted that a noncompete agreement signed by Ventura does not exist. On the other hand, PHS introduced credible evidence that Stephens in fact electronically signed the purported noncompete agreement by logging into PHS's electronic human resources ("HR") platform.

Ultimately, despite the alarming evidence regarding PHS's practices within its HR

department and credible evidence that PHS forged (at least some) third parties' signatures, Defendants have not established, by clear and convincing evidence, that PHS committed fraud on *this court* by filing *this lawsuit* based on forged documents. As a result, the court will allow this litigation to proceed.[1]

## I.    BACKGROUND[2]

In a memorandum opinion and order dated December 16, 2020, this court held the parties' two pending motions to dismiss in abeyance and ordered that the parties undertake expedited discovery into Defendants' allegations that PHS perpetrated fraud on the court and abused the judicial process. (ECF Nos. 58–59.) As discussed more below, Defendants proffered credible allegations that the underlying noncompete agreements purportedly signed by Ventura and Stephens were either nonexistent (as to Ventura) or forged (as to Stephens). The court found these allegations so serious—and potentially determinative of PHS's breach of contract claim against Ventura and Stephens due to Virginia choice-of-law rules—that it set the matter for an evidentiary hearing.

The parties delved into discovery regarding the allegations of forgery and fraud on the court. But PHS did not seize the opportunity to demonstrate that the noncompete agreements were valid. Rather, PHS adopted obstructionist practices throughout the

---

[1] The parties' two pending motions to dismiss are no longer held in abeyance. The court will accordingly rule on Defendants' ripe motion to dismiss, and the parties shall resume briefing PHS's motion to dismiss Defendants' counterclaims according to the schedule outlined in the accompanying order. The court, however, declines to lift the stay on discovery until the court resolves both pending motions to dismiss. The court will enter an order lifting the stay on discovery at the appropriate time. Further, the court will enter an amended pretrial scheduling order once a new trial date is solidified.

[2] The court incorporates by reference the background section of its December 16, 2020, memorandum opinion. (ECF No. 58.) The court outlined the relevant procedural posture in detail in that memorandum opinion and will therefore not repeat it here.

discovery process by lodging boilerplate (and largely meritless) objections, not fully responding to relevant interrogatories, and not producing relevant documents—including Ventura's purported noncompete agreement. PHS's behavior in discovery culminated in a disastrous Rule 30(b)(6) deposition. PHS's corporate designee utterly failed to give *any* meaningful testimony on the 17 noticed deposition topics. As a result, in March 2021, Defendants filed a motion for discovery sanctions. (ECF Nos. 115, 119.) This court referred the motion to the Honorable Joel C. Hoppe, United States Magistrate Judge, who ultimately issued a Report and Recommendation. (ECF No. 30.)

Judge Hoppe thoroughly outlined PHS's discovery failures. (*See id.* at 41–42 ("The record gives no indication that PHS has even tried to discern answers to some of Defendants' questions. And PHS's assertions that Stephens and Ventura *in fact* signed the underlying non-compete agreements simply because PHS *believes* they signed those agreements are tautological and an abuse of the discovery process. PHS faces serious allegations of forgery and fraud on the Court. It should have welcomed the opportunity to fully rebut those allegations." (emphases in original).) Relevant here, Judge Hoppe recommended barring PHS from supplementing the answers given at the Rule 30(b)(6) deposition and precluding PHS from offering any evidence not produced before Defendants filed their motion for sanctions. The court adopted Judge Hoppe's Report and Recommendation in full. (ECF No. 138.)

After sanctioning PHS, this court held an evidentiary hearing on July 6, 2021. The court now issues this memorandum opinion to discuss the court's findings based on that hearing and rule on whether PHS has perpetrated fraud on the court.

3

## II.    EVIDENCE

The court heard testimony from 10 former PHS employees, including Defendants Stephens and Ventura. Nicole Kirk, PHS's prior human-resources manager, described the complex and "chaotic" nature of PHS's HR onboarding processes in 2018, and how PHS was largely unsuccessful at getting employees to return signed and notarized noncompete agreements. Eight prior employees testified that PHS forged their signature on various documents. And Ventura credibly testified that he never signed any kind of noncompete or nonsolicitation agreement while employed at PHS. Finally, PHS's expert witness, Santiago Ayala, a digital forensic analyst, analyzed login records from Paycor and Sprint records from Stephens's personal cellphone. He testified that a user logged into Paycor using Stephens's username and password, and that Paycor sent a multifactor authentication text message to her mobile number.

### A.    Nicole Kirk and PHS's Human Resources Processes

Nicole Kirk, PHS's prior human-resources manager, worked for PHS for slightly less than one year—between July 2, 2018, and April 7, 2019. She worked in the corporate headquarters located in Mooresville, North Carolina. In 2018, Ms. Kirk worked with PHS to streamline its HR processes by, among other things, switching to an HR platform called Paycor.

Prior to PHS's switch to Paycor in late 2018, Ms. Kirk described the HR onboarding processes as "a little chaotic" and "complex." (Hearing Tr. 45:13–15, July 6, 2021 [ECF No. 147].) Usually, office managers would e-mail a new employee a "new hire packet," which he or she would electronically sign via DocuSign. (Hearing Tr. 46:9–13.) New hires, however,

4

were supposed to physically print several documents and return them to the HR department. Relevant here, new hires were supposed to print, sign, notarize, and return a noncompete agreement. Defendants' Exhibit C confirms this process, which is a printout of a page titled: "Handbook Receipt and Acknowledgements and Other Policy Acknowledgements." (Defs.' Ex. C.) It instructs employees to "print and sign" four hyperlinked "policy acknowledgements." (*Id.*) One of the hyperlinked documents is a "Non-Compete Agreement." (*Id.*) It then instructs employees to return the documents to the HR department within three businesses days from their start date.

PHS sales representatives were also required to sign a Sales Commission Agreement ("SCA") upon starting work. It is undisputed that Defendants Ventura and Stephens signed SCAs. The SCAs include a statement that reads: "You agree to abide by the attached EMPLOYEE CONFIDENTIALITY AND NON-DISCLOSURE/NON-SOLICITATION AGREEMENT, which you will be required to sign before starting your employment with [PHS]." (*See* Defs.' Ex. A (Ventura's SCA); Defs.' Ex. H (Stephens's SCA).) When asked if she knew if the SCAs were supposed to have any documents *attached* to them, the following exchange occurred:

> Ms. Kirk: I believe [they were] supposed to be attached, but I think it actually was referencing the new hire pack, which had the [noncompete] it references inside of it, basically. But you still have to—it's a link. So you would have to click on that link, open it up, print it, physically sign it, and return it.
>
> Defense Counsel: I will clarify what you just said. So when you say something was attached, are you familiar with an employee—with the term an employee nondisclosure/nonsolitication agreement?
>
> Ms. Kirk: Yes.

> Defense Counsel: And how was a new hire supposed to receive that document?
>
> Ms. Kirk: So that was sent from whoever was sending the new—basic new hire package. So whether it was Lauren [Harper] or Vanessa Mason, whoever that office manager was at that location, it would come directly from them, and there would be—you were signing that you acknowledge that you got the new hire packet, but that actual form [noncompete agreement] was not in there. It was just a link that opened to that document.
>
> Defense Counsel: And then how were you supposed to sign that document once you clicked on the link?
>
> Ms. Kirk: You were supposed to print it, physically sign it, have it notarized, and then send it back to the corporate office.

(Hearing Tr. 47:9–48:5.) Ms. Kirk believed that the hyperlinked "Non-Compete Agreement" in the new-hire packet was the "Employee Confidentiality and Non-Disclosure/Non-Solicitation Agreement" referenced in the SCA. (*See* Hearing Tr. at 48:22–49:3.)

In sum, the evidence indicates that in 2018, when PHS hired a new sales representative, an office manager would send them a new-hire packet and an SCA. The sales representatives—like Ventura and Stephens—signed the SCAs through DocuSign. An agreement called an "Employee Confidentiality and Non-Disclosure/Non-Solicitation Agreement" was supposed to be "attached" to the SCA; however, it appears that the document was never attached to the SCA. Rather, the agreement was hyperlinked in the new-hire packet. New hires were supposed to print out this agreement (among others), physically sign it, have it notarized, and then send it back to the HR department within three days of starting work at PHS.

Ms. Kirk testified that this multi-step process ultimately caused problems for PHS's HR department. After she started working at PHS, Ms. Kirk asked one of her subordinates,

Lauren Harper, how often new hires would actually print, sign, notarize, and return the "Employee Confidentiality and Non-Disclosure/Non-Solicitation Agreement." Ms. Kirk testified that PHS employees returned an "extremely low [amount] percentage-wise." (Hearing Tr. 50:2–13.) Ms. Kirk testified that her question "triggered a whole bunch of events," and that Ms. Harper "panicked." (Hearing Tr. 50:9–10, 51:2–11.) Ms. Harper then "started to try to get employees to return them, because we were missing them." (Hearing Tr. 51:9–11.)

Ms. Kirk testified that in the aftermath of this conversation, a "large amount" of noncompete agreements—between "50 to 100"—appeared "all at once." (Hearing Tr. 53:17, 54:5–7.) She did not know exactly how this happened. Nevertheless, their sudden appearance came to Ms. Kirk's attention when another employee, Julie Trivette, approached Ms. Kirk to tell her that she was not comfortable notarizing the stack of noncompete agreements when the respective employees were not standing in front of her. (*See* Hearing Tr. 51:13–18, 52:12–20.) When asked if she knew who had instructed Ms. Trivette to notarize the documents without the employees standing in front of her, Ms. Kirk responded: "So I think that was expected of her." (Hearing Tr. 52:24.) Ms. Kirk testified that when she looked through the stack, she noticed that some of the noncompete agreements were for people "who had already been terminated and were no longer employed there," and that "the color of the ink was the same." (Hearing Tr. 53:17–22.) Ms. Kirk instructed Ms. Trivette not to notarize any of these noncompete agreements.

Ms. Trivette's testimony confirmed Ms. Kirk's account. Ms. Trivette testified that she was asked to notarize "out-of-state new hire paperwork." (Hearing Tr. 70:8–10.) She testified

7

as follows:

> Ms. Trivette: And then at the beginning of [Ms. Kirk's] employment I was brought a stack of papers from—there was probably 50 in the stack, and I was asked to notarize them. And when I looked through them, a lot of them were from Ohio. And I told the person currently—that was in that position, Lauren Harper, that I couldn't notarize them because they were from Ohio, and I gave them back to her.
>
> . . .
>
> Defense Counsel: What was the conversation like between you and Nicole Kirk about notarizing these out-of-state documents?
>
> Ms. Trivette: She agreed that I couldn't notarize them because the person wasn't there, first of all, and as a notary I can't do that, and because they were out of state. A lot of the other packets were from North Carolina, but they were older. And some of the employees we noticed weren't even employed there anymore.
>
> . . .
>
> Defense Counsel: Ms. Trivette, did you—did you recall looking at the actual signatures from document to document?
>
> Ms. Trivette: I do.
>
> Defense Counsel: Did anything stand out to you about those signatures?
>
> Ms. Trivette: All of the signatures were in the same colored ink, and they were all written with the same handwriting.

(Hearing Tr. 70:8–72:6.) Ms. Trivette testified that when she told Ms. Harper that she would not notarize the stack of agreements, Ms. Harper became "irate about it." (Hearing Tr. 72:16.) Ms. Trivette never notarized the stack of agreements.

Further, Ms. Kirk asked the intern, Matt Burgess, if he had been instructed to "fill anything out with those." (Hearing Tr. 58:7–8.) Ms. Kirk testified that the noncompete

agreements were "still missing hire dates," and that Mr. Burgess had been instructed by Ms. Harper to look them up and fill them in. (Hearing Tr. 58:18–24.)  When counsel asked if Ms. Kirk knew what happened to the stack of agreements, she stated that they should have been scanned to the employee's electronic file on Dropbox, but that she was not sure what actually happened to them.

Thereafter, Ms. Kirk worked on revamping the HR processes for PHS. First, PHS transferred to the Paycor HR platform in December 2018 so that its onboarding processes would be entirely electronic. Second, after receiving instructions from company president Steve Murphy, Ms. Kirk worked with counsel for PHS to create a new noncompete agreement—the "Restrictive Covenants and Invention Assignment Agreement" ("RCIAA")—which did not require notarization. Once the RCIAA was finalized in late March or early April 2019, Ms. Kirk "sent it out to the entire company [through Paycor] and asked that everyone re-sign a new document." (Hearing Tr. 63:5–7.)

Importantly, Ms. Kirk stated the following regarding Paycor: "So one of the nice features about that system is anything that is sent to an employee to electronically sign, no one else can physically go in there and even pretend to be you. It tracks who logs in and actually signs it."[3] (Hearing Tr. 62:21–25.) She later testified that HR professionals had "high level" access and could "get into an employee's profile," but that it would be "physically impossible" for an HR professional to sign a document for an employee within Paycor. (Hearing Tr. 64:8–12.) She also testified that the only way an HR professional could

---

[3] PHS's Rule 30(b)(6) deponent testified that in April 2019, HR administrators "had the ability to add new employees, terminate employees, upload documents . . . change passwords, pull reports, [and] things of that nature" within Paycor. (Dep. of Meredith Branch at 62:19–25, Feb. 25, 2021 [ECF No. 119-2].)

theoretically sign a document for an employee in Paycor would be to possess the employee's personal username and password.

**B.    Brian Ventura**

With this background in mind, the court turns to the evidence surrounding Defendant Brian Ventura.

Ventura started working for PHS as a sales representative in August 2018. According to the timeline established by Ms. Kirk's testimony, Ventura onboarded with PHS before it switched to Paycor, and while it still required employees to print, sign, notarize, and return the separate "Employee Confidentiality and Non-Disclosure/Non-Solicitation Agreement." Ventura recalled signing the SCA, a background-check authorization, and direct-deposit information when he started. When directed to the language in the SCA about the attached "Employee Confidentiality and Non-Disclosure/Non-Solicitation Agreement," Ventura testified that he never received such a document, and that it was not attached to the SCA.

Ventura also testified that he never signed a noncompete agreement with PHS at any time during his employment. Specifically, Ventura testified that he did not sign a noncompete agreement in April 2019—the timeframe in which PHS was trying to get employees to sign the RCIAA—because he had "already made [his] decision to leave [PHS] and join Sigora." (Hearing Tr. 33:5–6.) Ventura specifically remembered receiving the noncompete agreement via his PHS email, reviewing the document, and deciding not to sign it. He resigned from PHS on April 29, 2019.

When Ventura received PHS's cease-and-desist letter approximately one year later, he testified that he "wasn't concerned" because he "didn't sign a confidentiality agreement" or

"disclose any confidential information." (Hearing Tr. 34:19–23; Defs.' Ex. B.) Attorneys for PHS did not attach a confidentiality agreement or a noncompete agreement to Ventura's cease-and-desist letter, and to this day, have not produced one. (Hearing Tr. 223:15–19 (Steve Murphy: "I was advised at the time that we had [Ventura's noncompete] by our counsel, as I said. . . . And I had seen Raven Stephens's, and I thought I had seen Brian Ventura's as well. So I made an error and I own it. I said it. It was an error."); *id.* at 242:17–18 ("Counsel for PHS: It's obviously clear at this point that we do not have a signed [RCIAA] with Mr. Ventura.").)[4]

## C.      Raven Stephens

Next, the court turns to the evidence regarding Defendant Raven Stephens. Like Ventura, Stephens started her employment with PHS in August 2018 and signed an SCA through DocuSign. (Defs.' Ex. H.) Stephens also testified that there was no "Employee Confidentiality and Non-Disclosure/Non-Solicitation Agreement" attached to the SCA, and that she never received such a document before starting at PHS.

Stephens testified that "[s]ometime in 2019 at a monthly sales meeting," PHS asked employees to sign a noncompete agreement (presumably the RCIAA). (Hearing Tr. 117:3.) Stephens testified as follows:

> Defense Counsel: What was your reaction to being asked to sign a noncompete by Power Home Solar, LLC?
>
> Stephens: That I wasn't going to sign it.

---

[4] Ms. Kirk testified that in 2018, after the stack of noncompete agreements appeared in PHS's corporate headquarters, she raised her concerns with Murphy. She also testified that Murphy "gave [her] instruction on how he would like me to handle that," which was "[t]o work with Power Home's attorney to get [the noncompete-agreement process] revised and switched over [to an electronic platform]." (Hearing Tr. 54:23–55:19.) This evidence therefore suggests that Murphy was aware PHS had significant problems with its HR department getting employees to sign noncompete agreements in 2018.

       <u>Defense Counsel</u>: Why is that?

       <u>Stephens</u>: I didn't want to sign it.

       <u>Defense Counsel</u>: Did you have any reasons you didn't want to sign a noncompete?

       <u>Stephens</u>: I didn't want to be bound by the terms. I was unsure of my future with the company. I didn't agree with some of the business practices.

(Hearing Tr. 117:6–15.) Stephens testified that she did not sign the agreement by hand or electronically.

After Stephens resigned from PHS in February 2020, PHS's counsel sent a cease-and-desist letter almost a year later with an attached RCIAA bearing her electronic signature. (Defs.' Ex. I.) She testified that she was "angry" upon seeing the letter, because she "didn't sign [it]." (Hearing Tr. 120:5–7.) When asked how certain she was that she did not sign the RCIAA, she replied, "I'm positive . . . I wouldn't have signed it. I had the opportunity to sign it, and I didn't." (Hearing Tr. 120:8–12.) On cross-examination, Stephens stated that it was "possible" that she signed the RCIAA but insisted that she "would have remembered signing this document." (Hearing Tr. 126:16–17.) Stephens remembered having a Paycor account and using it to access her paystubs. She testified that she did not use Paycor to sign anything.

Two pieces of evidence, however, strongly suggest that Stephens logged into Paycor and signed the RCIAA. First, Stephens's paystub dated April 26, 2019, indicates that PHS paid Stephens a $50 "bonus." (Pl.'s Ex. 1.) PHS offered $50 bonuses for those who signed the RCIAA.

Second, PHS's expert witness, Santiago Ayala, reviewed Paycor's sign-in records and Stephens's cellphone records from Sprint. (Pl.'s Ex. 5.[5]) The Paycor sign-in records indicate that on April 1, 2019, at 19:38 eastern standard time (7:38 p.m.), a user attempted to log into Paycor using Stephens's username and password. According to Mr. Ayala, after the attempted login, the user received a notification from Paycor that she "needed to authenticate into the system with a second factor, a multifactor." (Hearing Tr. 206:12–13.) Paycor sent the first multifactor authentication (a code) to an email address. The user then attempted to log in again using the username and password; this second time, PHS sent the multifactor authentication (another code) as a text message. The multifactor challenge via the text message was successful, and the user was thereafter allowed into the system.

The Paycor sign-in records do not contain the phone number to which the text message was sent. PHS, however, subpoenaed Sprint records for Stephens's cellphone number.[6] (Pl.'s Ex. 6.) The Sprint records for Ms. Stephens's number show that on April 1, 2019, at 18:38:34 central standard time (19:38 eastern standard time, or 7:38 p.m.), she received an inbound text message from the phone number 513-657-1970. Mr. Ayala "called that number [513-657-1970] and the voice message on that number [said] that it's the Paycor number in order to add the number that called in to the multifactor for the Paycor system." (Hearing Tr. 207:25–208:2.)

The electronic signature on Stephens's purported RCIAA is time-stamped on April 1,

---

[5] PHS's Exhibit 5 is a subset of a larger, approximately 15,000-page file produced by Paycor to Mr. Ayala. Mr. Ayala narrowed the relevant information regarding Ms. Stephens's login information and provided it to the court. An Paycor employee, Zachary Briggs, provided a certification that the records were accurate under Federal Rule of Evidence 902(11).

[6] The court will not reproduce her phone number in this opinion to better protect Ms. Stephens's privacy.

2019, at 7:41:48 p.m., or three minutes after Paycor sent the multifactor authentication to her phone via text. (Defs.' Ex. I.) As such, the evidence indicates that a user using Stephens's username and password successfully logged into Paycor via a multifactor authentication sent to her phone approximately three minutes before the RCIAA was electronically signed. Put differently, the evidence strongly suggests that Stephens logged into her Paycor account and signed the agreement.

**D.      Prior Employees Alleging that PHS Forged Their Wet Signatures**

At the hearing, Defendants elicited highly concerning testimony from several former PHS employees that they had later seen their wet signatures on various documents they did not sign. Presumably, Defendants called these former employees to buttress Ventura's and Stephens's claims that they did not sign the noncompete agreements at issue in this lawsuit.

The first of those employees was Julie Trivette. Defendants introduced a document into evidence (which was an "interconnection agreement," not a noncompete agreement), purportedly signed and notarized (using her notary stamp) by Ms. Trivette. (Defs.' Ex. D.) Ms. Trivette testified that she did not sign the verification page of the document because (1) she would have filled it out differently; (2) it was not in her handwriting, and (3) it is dated *after* PHS terminated her. PHS terminated Ms. Trivette on February 15, 2019, and the document is dated March 8, 2019. She testified that she never signed a document for PHS after she was fired.

Second, Kassie Rich testified that she witnessed forgeries while employed at PHS. Specifically, Ms. Rich testified that two PHS executives asked one of her subordinate employees in the customer-service department to forge a signature on a customer's contract.

14

She testified that she witnessed the forgery take place. She also testified that she witnessed such forgeries "numerous times." (Hearing Tr. 82:2.)

Further, Ms. Rich testified that PHS forged her signature on two documents. The first document[7] contains Ms. Rich's purported wet signature and her notary stamp. (Defs.' Ex. E.) The document is dated January 1, 2019, but PHS had terminated Ms. Rich's employment approximately four months earlier, on September 4, 2018. Like Ms. Trivette, Ms. Rich testified that she did not sign or notarize the document because it was dated after PHS fired her. Then, approximately one week after PHS fired her, Ms. Rich received a cease-and-desist letter from PHS's counsel. (Defs.' Ex. F.) PHS attached a document titled "Non-Competition and Non-Disclosure Agreement" to the cease-and-desist letter, which bears Ms. Rich's purported wet signature. She testified that she had never seen the document before and that her signature was forged. The noncompete agreement is dated January 16, 2017; Ms. Rich testified, however, that she signed her employment paperwork on December 27, 2016 (her first day of work with PHS), and she never signed any employment paperwork after that date. She clarified that both documents contain what appears to be her physical signature, but that she did not sign either document.

Third, Kelsey Skidmore testified that PHS forged her signature on two almost identical documents, both titled "Non-Competition and Non-Disclosure Agreement." (Defs.' Ex. G.) The two agreements are inexplicably dated approximately one month apart: one is dated September 12, 2016, and the second is dated October 18, 2016. Like Ms. Rich, Ms. Skidmore testified that the two agreements contained a signature that resembled hers,

---

[7] It is not clear what the document is, but it contains the PHS logo at the top of the page.

but adamantly insisted that she never signed them. Ms. Skidmore testified that she signed "numerous documents and applications that [she] sent to utility companies" during her employment at PHS and speculates that the signatures were superimposed from those documents. (Hearing Tr. 105:20–22.)

**E.   Prior Employees Alleging that PHS Forged Their Electronic Signatures**

Like Stephens, four former PHS employees—Harris Parker Schram, Ben Parrish, Josh Hawk, and Bradley Shaver—testified that despite their electronic signatures appearing on the bottom left-hand corner of RCIAAs, they never signed them. (*See* Defs.' Ex. J (Schram RCIAA); Defs.' Ex. L (Parrish RCIAA); Defs.' Ex. O (Hawk RCIAA); Defs.' Ex. Q (Shaver RCIAA).)

First, Mr. Schram worked for PHS for approximately three years. He testified that he knew he did not sign the RCIAA because the electronic signature date—April 3, 2019—was "about three months before [he left PHS], and [he] already knew [he] was halfway out the door at that time." (Hearing Tr. 133:21–23.) In his words, "I know I'd never sign a restrictive covenant." (Hearing Tr. 133:23.) Mr. Schram did not remember ever logging into PHS's HR software to review paystubs (or other documents) during the last six-or-so months of his employment at PHS (*i.e.*, between the time PHS started using Paycor and the end of his employment). PHS sued Mr. Schram in North Carolina state court—in a nearly identical lawsuit—for his alleged violation of the RCIAA.

Second, Ben Parrish, a former PHS sales representative, testified that he signed an SCA. (*See* Defs.' Ex. K.) Mr. Parrish did not recall an "Employee Confidentiality and Non-Disclosure/Non-Solicitation Agreement" being attached to the SCA. Ms. Parrish also

16

testified that he did not sign an RCIAA in April 2019, and that he had "never seen it" before PHS attorneys later attached it to a cease-and-desist letter. (Hearing Tr. 151:14; Defs.' Exs. L, M.) Mr. Parrish remembered using Paycor to look at paystubs and had log-in information for the system. He did not remember ever using Paycor to sign anything. PHS also sued Mr. Parrish in North Carolina state court for his alleged violation of the RCIAA.

Third, Joshua Hawk previously worked as PHS's national project manager. He worked there for approximately four years, with a brief break in the middle of his employment. Mr. Hawk remembered PHS sending out the RCIAA agreement that "they wanted everybody in the company to sign." (Hearing Tr. 162:8–10.) He testified, "I mean, I guess they emailed it out, or they sent it out through the Paycor app, you know, and just asked everybody if they'd sign that. I learned later on . . . they were giving out $50 awards for people who did sign it and send it back in on their Paycor." (Hearing Tr. 162:10–14.) When asked about his reaction to the RCIAA, he responded: "[M]e and a lot of the people that ha[d] been there for a little bit of time and had a lot of responsibility there just weren't going to sign a noncompete for $50. So we really didn't pay any attention." (Hearing Tr. 162:24–163:2.) Mr. Hawk testified that the first time he had seen the RCIAA with his electronic signature affixed to it was when PHS attorneys attached the document to a cease-and-desist letter before filing suit against him in North Carolina. (*See* Defs.' Exs. N, O.)

Fourth, Bradley Shaver worked for PHS from approximately one year, between January of 2020 and January of 2021. After Shaver left his employment with PHS, PHS sued him in North Carolina and attached an RCIAA purportedly electronically signed by him to the complaint. (Defs.' Ex. Q.) The RCIAA has a filled-in date of December 2, 2019. The

electronic signature on the bottom of the agreement, however, is dated December 20, 2019. Mr. Shaver reiterated that he was not employed by PHS in December of 2019. Mr. Shaver adamantly testified that he never signed the document, stating: "I have years of experience in solar. I would never sign a document that would restrict my ability to continue in renewable energy. It wouldn't make sense. I would shoot myself in the foot by doing that." (Hearing Tr. 182:20–23.) On cross-examination, however, Mr. Shaver noted that he "only signed documents before [he] started," and that he "never signed documents after [he] started." (Hearing Tr. 186:11–12.) The testimony did not establish when exactly he believed he signed onboarding paperwork.

### III.   DISCUSSION

Fraud on the court is not "garden-variety fraud." *Fox v. Elk Run Coal Co.*, 739 F.3d 131, 135 (4th Cir. 2014). Fraud on the court involves the "corruption of the judicial process itself." *Cleveland Demolition Co. v. Azcon Scraps Corp.*, 827 F.2d 984, 986 (4th Cir. 1987) (citation omitted). Ordinarily, a finding of fraud on the court is limited to egregious cases, including "bribery of a judge or juror, or improper influence exerted on the court by an attorney, in which the integrity of the court and its ability to function impartially is directly impinged." *Great Coastal Express v. Int'l Brotherhood of Teamsters*, 675 F.2d 1349, 1356 (4th Cir. 1982). A party must establish fraud on the court by clear and convincing evidence. *See United States v. MacDonald*, 161 F.3d 4 (Table), 1998 WL 637184, at *2 (4th Cir. 1998).

Ultimately, Defendants have not shown that PHS committed fraud on the court, at least not by clear and convincing evidence, at this preliminary stage of the proceeding. While much of Defendants' evidence was alarming—and strongly suggests that PHS has a history

of forging signatures on various documents—Defendants have not shown by clear and convincing evidence that PHS's conduct, as it pertains specifically to *this case* and *these defendants*, abused the judicial process. Specifically, the evidence indicating that Stephens used her personal cell phone to log into her Paycor account approximately three minutes before the time-stamped electronic signature on her purported RCIAA precludes any finding by clear and convincing evidence that it was a forgery (at this point in time). And while PHS's former *pro hac vice* counsel should not have filed this lawsuit against Ventura before ensuring that PHS possessed a noncompete agreement signed by him, this failure—which toes the line of sanctionable conduct—does not rise to the level of fraud on the court.

With that said, however, Defendants correctly identified two outstanding questions which neither party could answer at the evidentiary hearing. First, how is a document signed in the Paycor platform? Once an employee logs into the system, does Paycor automatically sign a document for the user? Does a notification appear informing the user that a document is awaiting their signature? Does the user simply have to check a box to sign a document? Or, once an employee logs into the system, does she have to specifically click on a document, type in her name for the electronic signature, and "click through" the document to affix her signature?

Second (and relatedly), is there an electronic record of actions taken once an employee has logged into Paycor that would dispositively prove—either way—that Stephens (and the other former employees) signed the RCIAA? Despite these being critical questions, PHS never provided the answers in discovery and Defendants, despite their best efforts, were hamstrung from investigating them further. PHS's failure to provide those answers—or

19

produce a witness that could[8]—is notable because such evidence could presumably quash any forgery allegations. All that is to say, while PHS did not carry its burden of proving fraud on the court, the court is concerned that PHS's obstructive behavior in discovery impaired Defendants' ability to prove their allegations and the court's truth-seeking function.[9] Should Defendants' pending counterclaims for forgery, fraud, and fraud on the court proceed in this litigation, the court expects PHS to produce these answers in discovery.

Finally, the court notes that this decision is in no way dispositive or preclusive of Defendants' actual counterclaims for forgery, fraud, and fraud on the court, which are still pending in this action. (*See* ECF No. 36.) If those claims survive the pending motion to dismiss, Defendants are entitled to appropriate discovery that they have not already obtained, and to receive a final judgment on the merits of those claims, which unlike fraud on the court at this juncture, need only be proven by a preponderance of the evidence.

In sum, while the court remains concerned about the validity of Stephens's RCIAA and PHS's HR and notary practices, the evidence does not establish by clear and convincing evidence that PHS has committed fraud on the court or abused the judicial process at this point in the proceeding. As a result, the court will allow this litigation to proceed.

---

[8] PHS's expert witness, Mr. Ayala, had "read-only" access to Paycor, and was not able to sign a document on the platform. (*See* Hearing Tr. 209:13–21.)

[9] Given this, and PHS's other discovery abuses—including its failure to appropriately respond to Defendants' interrogatories and requests for production of documents, its lodging of meritless and boilerplate objections, and its woefully inadequate preparation for the Rule 30(b)(6) deposition—the court will not hesitate to sanction PHS and its attorneys again if they engage in similar conduct during the course of this litigation.

### III.  CONCLUSION

For the reasons stated above, the court does not find that PHS committed fraud on the court. A separate order will issue.

The Clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

**ENTERED** this 12th day of August, 2021.


*/s/ Thomas T. Cullen*
_____
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE