UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

|  |  |  |
|---|---|---|
| POWER HOME SOLAR, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:20-cv-00042 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| SIGORA SOLAR, LLC, *et al.*, | ) | By:   Hon. Thomas T. Cullen |
| | ) |        United States District Judge |
| Defendants. | ) | |

Defendants Sigora Solar, LLC ("Sigora"), Brian Ventura, and Raven Stephens (collectively, "Defendants") have moved to dismiss Plaintiff Power Home Solar, LLC's ("PHS") complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6). Because PHS's complaint is replete with legal conclusions and devoid of sufficient facts to state any plausible claim, the court will grant Defendants' motion to dismiss.

## I.   BACKGROUND

PHS filed this lawsuit in the Circuit Court of the City of Charlottesville in June 2020 against Sigora, Stephens, and Ventura. Defendants removed the case to this court in July 2020. (ECF No. 1.)

PHS is a solar energy company that sells solar systems to homeowners and commercial businesses. Sigora is PHS's competitor in the renewable energy business. PHS alleges that Sigora induced its former employees—Stephens and Ventura—to cease their employment with PHS and join Sigora. When Stephens and Ventura left PHS for Sigora, PHS alleges that they absconded with its trade secrets at the behest of Sigora and are now

1

misappropriating them. PHS also alleges that Stephens and Ventura are violating various provisions of employment agreements that they allegedly signed while employed at PHS.

PHS's complaint brings 12 counts: (1) breach of employment agreements by Stephens and Ventura; (2) aiding and abetting breach of restrictive covenants against Sigora; (3) misappropriation of trade secrets under the federal Defend Trade Secrets Act ("DTSA") against Defendants; (4) aiding and abetting misappropriation of trade secrets under the DTSA against Sigora; (5) misappropriation of trade secrets under Virginia's Uniform Trade Secrets Act ("VUTSA") against Defendants; (6) common law unfair competition against Defendants; (7) civil conspiracy against Defendants; (8) tortious interference with contract against Sigora; (9) turnover of property to PHS and for an accounting against Defendants; (10) unjust enrichment against Defendants; (11) motion for preliminary and permanent injunctive relief; and (12) punitive damages against Defendants under VUTSA and DTSA.

## II.    STANDARD OF REVIEW

Motions to dismiss under Rule 12(b)(6) test the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). A claim is facially plausible when the plaintiff's allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While a complaint does not need "detailed factual allegations," complaints merely offering "labels and conclusions," "naked assertion[s] devoid of 'further factual enhancement,'" or "a formulaic recitation of the

elements of a cause of action will not do." *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555, 557).

## III.   ANALYSIS

### A.   Breach of Contract (Count I)

#### 1.   Choice of Law[1]

The first matter of concern is what law applies to the relevant contracts. PHS alleges that Ventura and Stephens signed an agreement called the "Restrictive Covenants and Invention Assignment Agreement" ("RCIAA"). (ECF No. 19 at 39–43.) Section 13 of the RCIAA states: "This Agreement, and all transactions contemplated by this Agreement, shall be governed by, construed and enforced in accordance with the laws of the State of Michigan." (*Id.* at 42.)

"When deciding state law claims under supplemental jurisdiction, federal courts apply the choice-of-law rules of the jurisdiction in which they sit." *McFarland v. Va. Ret. Servs. of Chesterfield, LLC*, 477 F. Supp. 2d 727, 732 (E.D. Va. 2007) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941)). As such, this court must apply Virginia's choice-of-law rules to determine what law applies.

Under Virginia choice-of-law rules, "[i]f a contract specifies that the substantive law of another jurisdiction governs its interpretation or application, the parties' choice of substantive law should be applied." *Settlement Funding, LLC v. Von Neumann-Lillie*, 645 S.E.2d 436, 438 (Va. 2007) (citation omitted). As such, Virginia gives choice-of-law clauses full effect except in "unusual circumstances." *PNC Bank, Nat'l Ass'n v. Dominion Energy Mgmt.*,

---

[1] The court previously ruled that PHS waived the forum-selection clause for Michigan courts. (*See* ECF No. 51.)

*Inc.*, No. 3:17cv311, 2018 WL 1768061, at *4 (E.D. Va. Apr. 12, 2018) (quoting *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 624 (4th Cir. 1999)). "Unusual circumstances exist where there is 'no reasonable basis' for the choice-of-law provision, or where a party agreed to the provision due to improper means such as fraud or misrepresentation." *Id.* (quoting *Run Them Sweet, LLC v. CPA Glob. Ltd.*, 224 F. Supp. 3d 462, 466 n.2 (E.D. Va. 2016)).

Here, the court finds that there is no reasonable basis for the Michigan choice-of-law provision. According to PHS's complaint, Stephens and Ventura have no relationship to Michigan; they both reside in Virginia and worked exclusively in Virginia for PHS. (*See* Compl. ¶¶ 3–5 [ECF No. 1-3].) PHS is also a Delaware limited liability company with its principal place of business in North Carolina. (*Id.* ¶ 1.) No allegations in the complaint demonstrate any factual relationship between the claims in this lawsuit and Michigan, and PHS brought claims exclusively under federal and Virginia state law. Therefore, under Virginia's choice-of-law rules, the court will apply Virginia law to PHS's breach of contract claim.

**2.      Conversion of Motion to Dismiss to a Motion for Summary Judgment**

Defendants argue that the court can and should dismiss PHS's breach-of-contract claim with prejudice because the restrictive covenants in Stephens's and Ventura's employment agreements are facially unenforceable. PHS asserts that such a ruling would amount to "judgment on the pleadings." (ECF No. 16 at 11.) PHS further states: "Discovery is just beginning, and to the extent the analysis of whether a covenant is reasonable is based on the circumstances of the case, a decision on this issue with a fact-intensive case as the subject action is not appropriate on a motion to dismiss." (*Id.*)

4

The enforceability of a restrictive covenant is a matter of law to be decided by the court. *Omniplex World Servs. Corp. v. U.S. Investigations Servs., Inc.*, 618 S.E.2d 340, 342 (Va. 2005). And courts adjudicate the legality of restrictive covenants at various stages of the proceeding: some at a motion to dismiss (or demurrer in Virginia state court), and some at a motion for summary judgment. *See O'Sullivan Films, Inc. v. Neaves*, 352 F. Supp. 3d 617, 623–27 (W.D. Va. 2018) (summary judgment); *Capital One Fin. Corp. v. Kanas*, 871 F. Supp. 2d 520, 530–38 (E.D. Va. 2012) (summary judgment); *Hawkins v. Fishbeck*, 301 F. Supp. 3d 650, 659–60 (W.D. Va. 2017) (motion to dismiss); *Specialty Mktg, Inc. v. Lawrence*, No. CL09000928-00, 2010 WL 7375616, at *2–3 (Va. Cir. Ct. Mar. 11, 2010) (demurrer).

At least one court in this district has warned, however, that "a court cannot adjudicate the enforceability of a [restrictive covenant] in a factual vacuum." *O'Sullivan*, 352 F. Supp. 3d at 624. "No two situations leading to the execution of a [restrictive covenant] are the same." *Capital One Fin. Corp.*, 871 F. Supp. 2d at 530. As such, "[e]ach non-competition agreement must be evaluated on its own merits, balancing the provisions of the contract with the *circumstances of the business and employees involved*." *Omniplex*, 618 S.E.2d at 342 (emphasis added). Recognizing that the enforceability of a restrictive covenant is a matter of law, the court also appreciates that the reasonableness of a restrictive covenant may depend on some facts—for example, the nature and geographic area of the employer's business, the market generally, and the relevant employee's position, seniority, and access to important information—that are not necessarily contained in the complaint.

Federal Rule of Civil Procedure 12(d) states:

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the

> motion must be treated as one for summary judgment under
> Rule 56. All parties must be given a reasonable opportunity to
> present all the material that is pertinent to the motion.

Fed. R. Civ. P. 12(d). The Fourth Circuit has ruled that "no formal notice of conversion by the district court is required in cases where it is apparent that what is nominally a Rule 12(b)(6) motion to dismiss is subject to conversion to a summary judgment motion—for example, where the motion is captioned in the alternative as a motion for summary judgment and affidavits are attached to the motion." *Carter v. Balt. Cnty.*, 39 F. App'x 930, 933 (4th Cir. 2002) (per curiam) (reversing a district court for converting a Rule 12(b)(6) motion into a summary judgment motion without giving notice to the parties). A district court may also not convert a motion to dismiss without giving the plaintiff notice and a "reasonable opportunity to conduct discovery." *Id.*

"It is often the case that a court should not convert a motion during the early stages of a case, when the nonmoving party may not have had an opportunity to conduct discovery and to present all material pertinent to the motion." *Caner v. Autry*, 16 F. Supp. 3d 689, 701 (W.D. Va. 2014) (citation and internal quotation marks omitted). When a court is considering conversion, the nonmoving party is typically "obliged to file an affidavit or declaration with the specific facts it seeks through additional discovery." *Id.* (citations omitted). Then, if the court finds that the information sought by the nonmoving party would not create a genuine issue of material fact sufficient to defeat summary judgment, the court may convert the motion and rule on summary judgment. *Id.* (citations omitted).

Here, the court gave the parties notice at the October 27, 2020 hearing on this motion that the court is considering converting Defendants' motion to dismiss into a motion

for summary judgment as to Count I only. The court accordingly provided PHS an opportunity to file an affidavit outlining any discoverable information regarding the reasonableness of the restrictive covenants at issue here.[2]

PHS submitted a declaration from Steve Murphy, PHS's President, "to demonstrate in good faith what the facts will show after discovery is completed in this action as it relates to the [RCIAA] between [PHS] and the individual defendants in this action." (Decl. of Steve Murphy ¶ 1, Nov. 10, 2020 [ECF No. 43-1].) Murphy's declaration describes how PHS interprets their "standard" employment agreements. (*Id.* ¶¶ 4–10.) Specifically, Murphy states:

- The "Business of the Company" and "Company's Business" as defined in the Agreement provides for the "sale, marketing, and installation of solar and roofing products and services . . . throughout the United States" *as applied to the specific position for each PHS employee and the location where the PHS employee is employed.* (*Id.* ¶ 5 (emphasis added).) For example, if a PHS employee is a sales agent working in PHS's main office in Mooresville, North Carolina, then the "Business of the Company" as applied to this specific PHS employee for purposes of the Agreement is limited to the employee's work as a sales agent with PHS and the Mooresville, NC office. (*Id.* ¶ 6.)
- The language in the Agreement is *construed narrowly* to apply to the *specific position and work location and/or service areas of the PHS employee.* (*Id.* ¶ 7 (emphasis added).)
- The Agreement *is applied accordingly to each PHS employee depending on their position, location of employment, exposure to trade secrets, and various other considerations* which determine the risk of misappropriation. (*Id.* ¶ 8 (emphasis added).)
- The Agreement is not applied as broadly as Defendants contend but are [*sic*] applied in a manner consistent with Virginia's laws regarding the validity of restrictive covenants. (*Id.* ¶ 9.)

---

[2] Often, plaintiffs are at an information-disadvantage and need discovery from the defendant to ultimately prove their claims. This situation is different, because PHS is in the best position to provide factual information about the solar-energy market, its employees, and why its specific restrictive covenants are necessary. PHS did not provide any of that information to the court when given the opportunity.

- The Agreement, as provided, is consistent with a narrower application as opposed to the broad application Defendants claim. (*Id.* ¶ 10.)

In sum, Murphy's affidavit speaks to how PHS purportedly chooses to enforce its noncompete agreements, but it does not outline any information PHS would provide (or seek) in discovery regarding the reasonableness of the restrictive covenants themselves. In other words, PHS did not proffer any discoverable information that it would need to support its claim by describing the relevant market or any specific information about Stephens's and Ventura's access to information (apart from the allegations in the complaint). The court therefore finds it appropriate to convert Defendant's motion to dismiss Count I into a motion for summary judgment.

### 3.    Summary Judgment Standard

Under Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets that burden, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn*, 710 F.3d at 213 (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)). "[T]o grant summary judgment[,] the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (citing *Anderson*, 477 U.S. at 248).

### 4. Analysis of Restrictive Covenants

#### i. Noncompete Covenant

Virginia law disfavors restrictive covenants because they are restraints on trade. *Omniplex*, 618 S.E.2d at 342. Noncompete agreements are only enforceable "if the contract is narrowly drawn to protect the employer's legitimate business interest, is not unduly burdensome on the employee's ability to earn a living, and is not against public policy." *Id.* (citation omitted). As such, their validity is a "threshold question," and if a noncompete agreement is invalid, the court need not consider whether a party in fact breached the agreement. *O'Sullivan*, 352 F. Supp. 3d at 623.

While validity is a threshold question, as noted above, courts "cannot adjudicate the enforceability of a noncompete in a factual vacuum." *Id.* at 624 (citation omitted). The court must consider the "function, geographic scope, and duration" of the restrictive covenant. *Home Paramount Pest Control Cos. v. Shaffer,* 718 S.E.2d 762, 764 (Va. 2011). The court must consider these interrelated factors together, because "a single consideration that is unreasonable may be reasonable as construed in light of the other two." *Cantol, Inc. v. McDaniel*, No. 2:06CV86, 2006 WL 1213992, at *4 (E.D. Va. Apr. 28, 2006).

Regarding the restrictive covenant's function, the court must consider "whether the prohibited activity is of the same type that is actually engaged in by the former employer." *Home Paramount*, 718 S.E.2d at 764. A valid noncompete provision prohibits "an employee from engaging in activities that actually or potentially compete with the employee's former employer." *Omniplex*, 618 S.E.2d at 342. When the provision seeks to bar the employee from working for a competitor *in any capacity*, the former employer must provide a legitimate business interest for doing so. *Home Paramount*, 718 S.E.2d at 765. Moreover, the geographic scope of a noncompete covenant "must be reasonably limited." *O'Sullivan*, 352 F. Supp. 3d at 624 (citation omitted).

Defendants argue that the noncompete covenant's function and geographic scope are overly (and fatally) broad. The court agrees. Here, the noncompete covenant states:

> Employee agrees that during Employee's employment with the Company and *for a period of twelve (12) months* following Termination, that he/she will not, directly or indirectly, enter into or engage in *any employment or business* (including any business or competitive organization owned in whole or in part by Employee) *involving the Business of the Company within the Restricted Areas*.

(ECF No. 19 at 40 (emphasis added).) Under the agreement, "'Restricted Areas' means a 100 mile radius from *each location* of the Company." (*Id.* (emphasis added).) Further, "Business of the Company" means "the sale, marketing, and installation of solar and roofing products and services on both a residential and commercial basis *throughout the United States*." (*Id.* at 39 (emphasis added).)

First, the noncompete covenant's function is essentially limitless. Under the provision, Ventura and Stephens cannot engage in "any employment or business" in the residential or commercial solar-energy market in the United States for one year. Apart from

the fact that this acts as a blanket geographical prohibition, the covenant does not seek to limit the prohibition to the kind of work that Stephens and Ventura actually performed for PHS (sales). *See Nortec Comm'ns, Inc. v. Lee-Llacer*, 548 F. Supp. 2d 226, 230 (E.D. Va. 2008) (finding a noncompete covenant unenforceable "because the functions that are proscribed by the non-compete agreement are not limited to the functions that were performed by [the employee]").

PHS's covenant is similar to the one examined in *Specialty Marketing, Inc. v. Lawrence*, which the court found unenforceable. 2010 WL 7375616 at *2–3. There, the noncompete provision prohibited the plaintiff from being "employed by . . . any business competitive with [the defendant]." *Id.* at *2. The court found that the language "far exceed[ed] whatever limitation would be necessary to protect [the employer's] business interests." *Id.* at *3. The covenant here is also similar to the restrictive covenant examined and rejected in *Simmons v. Miller*, 544 S.E.2d 666 (Va. 2001). The covenant in *Simmons* restricted the employee from engaging in "any business similar to the type of business conducted by [the employer]." *Id.* at 678. The Virginia Supreme Court held that the covenant was an unreasonable restraint on trade because the "restricted function is considerably broader than [the employer's] business activity." *Id.* at 678.

Here, the covenant is also broader than PHS's business activity. As evidenced by PHS's website,[3] the company does not service the entire United States. PHS cannot have a legitimate business interest in prohibiting employees from engaging in "any employment or business" related to the commercial or residential solar-energy market in the entire United

---

[3] The court accessed PHS's website at the following url: https://www.powerhome.com/. The court takes judicial notice of PHS's public website for purposes of this motion.

States.

Second, the noncompete agreement's geographic scope is exceptionally broad. The noncompete agreement restricts any competition with PHS within 100 miles of *each* location. (ECF No. 19 at 40.) PHS's public website boasts "coverage areas" in Georgia, Illinois, Indiana, Kansas, Kentucky, Michigan, Missouri, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, and West Virginia. While it is not clear exactly how many office locations PHS actually has in each state, as Defendants correctly note, this restriction effectively prohibits Stephens and Ventura from seeking employment in the solar-energy business in large swaths of the middle and eastern regions of the United States.

Perhaps recognizing the effect of this broad language, PHS's counsel attempted to minimize its scope at oral argument by stating that the geographic scope is limited within 100 miles of where the relevant employee worked. But counsel's argument ignores the plain language in the agreement, which provides no such limitation. The geographic scope encompassed in this noncompete agreement far exceeds the geographic scope of agreements that Virginia courts have found unenforceable. *See, e.g.*, *Lawrence v. Bus. Commc'ns of Va., Inc.*, No. CH99-1134, 2000 WL 33340626, at *3 (Va. Cir. Ct. May 5, 2000) (finding a noncompete agreement invalid because its geographic scope of 50 miles applied to each of the employer's locations).

Although the noncompete covenant's duration of 12 months appears reasonable on its face, the court must consider the function, geographic scope, and duration together. *See Simmons*, 544 S.E.2d at 678 ("We have previously found restrictive covenants lasting as long as three years to be reasonable under the circumstances of the particular case."). Ultimately,

however, because the function and geographic scope of the noncompete covenant vastly exceed a reasonable prohibition on trade, the reasonable duration does not redeem the restrictive covenant.

### ii. Nonsolicitation Covenant

Under Virginia law, nonsolicitation covenants are subject to the same legal considerations as noncompete covenants. *See Combined Ins. Co. of Am. v. Wiest*, 578 F. Supp. 2d 822, 828–29 (W.D Va. 2008). PHS's nonsolicitation covenant states:

> Employee agrees that during Employee's employment with the Company and for a period of twelve (12) months following Termination, that he/she will not, directly or indirectly, solicit, attempt to procure or do business with, or assist anyone in soliciting, attempting to procure, or doing business with *any Customers of [PHS]*.

(ECF No. 19 at 40 (emphasis added).) Under the agreement, "Customers" means "those individuals, companies or government entities for whom [PHS] provides Products and Services in connection with the Business of the Company or for whom [PHS] has actively solicited in connection with the Business of the Company in the two years prior to Employee's Termination." (*Id.*) In other words, for one year, Stephens and Ventura would not be able to contact any of (1) PHS's active customers, or (2) customers that PHS solicited in the last two years. (*Id.*)

Several cases are instructive. In *Brainware, Inc. v. Mahan*, the court found that a nonsolicitation covenant was enforceable because it "expressly limit[ed] the restriction on solicitation only to those clients who were contacted, solicited, or served by [the employee] while he was employed by [the employer]." 808 F. Supp. 2d 820, 828 (E.D. Va. 2011). On the other hand, in *Lasership Inc. v. Watson*, the restrictive covenant prohibited the former

13

employee from contacting or soliciting "any of the Company's Customers" for two years. No. CL-2009-1219, 2009 WL 7388870, at *1, *8 (Va. Cir. Ct. Aug. 12, 2009). That agreement defined "Customers" as "any person or entity invoiced in the year before the employee left [the employer's] employ." *Id.* at *8. The court found that the nonsolicitation covenant was overly broad and unenforceable because it "impose[d] an unreasonable burden on the employee to know all the customers invoiced in that year period." *Id.*

Here, the nonsolicitation covenant is broader than the covenants in *Brainware* and *Lasership*. Whereas the enforceable covenant in *Brainware* restricted the solicitation of customers to those that the employee directly worked with or solicited, PHS's covenant restricts employees from contacting *any* of PHS's customers, regardless of the employee's prior contact with them. Moreover, the court in *Lasership* found the covenant unenforceable when it imposed an unreasonable burden on an employee to know all of the customers invoiced *one* year prior. Here, PHS's nonsolicitation covenant prohibits former-employees' contact with customers *and* those that PHS *solicited* (but perhaps never became customers) in the previous *two* years. These stark differences illustrate the unreasonableness of PHS's nonsolicitation covenant and render it unenforceable as a matter of law.

### iii.    Nondisclosure Covenant

Like noncompetition and nonsolicitation covenants, nondisclosure covenants "represent disfavored restraints on trade, and the test of their sufficiency involves the same balancing test that is applied to [noncompete] and [nonsolicitation] agreements." *Brainware*, 808 F. Supp. 2d at 828 (citing *Lasership Inc.*, 2009 WL 7388870, at *8). "The protection afforded to confidential information should reflect a balance between an employer who has

14

invested time, money and effort into developing such information and an employee's general right to make use of knowledge and skills acquired through experience in a field or industry for which he is best suited." *Lasership Inc.*, 2009 WL 7388870, at *8.

Here, PHS's nondisclosure covenant states:

> Employee agrees he/she will *not at any time whatsoever*: (1) use any Confidential Information outside the scope of employment; (2) reveal or disclose Confidential Information to any person, firm, corporation or any other entity other than [PHS]; or (3) remove or aid in the removal of any Confidential Information from the Company's premises.

(ECF No. 19 at 40.) Again, the court's reasoning in *Lasership* is persuasive. There, the confidentiality covenant prohibited the disclosure of the company's information "at any time or in any manner, without consent by the company, regardless of the circumstances . . . to any person, firm, corporation or other entity." *Id.* at *1. The court found that the provision was unreasonable because it precluded the defendant "from telling a neighbor for the rest of her life *anything* about [the employer], including information that is not proprietary in nature or worthy of any confidence." *Id.* (emphasis in original).

Further, in *Darton Environmental, Inc. v. FJUVO Collections, LLC*, a court in this district found a confidentiality covenant unenforceable because it did not contain a "temporal limitation." 332 F. Supp. 3d 1022, 1030 (W.D. Va. 2018). Moreover, a court in the Eastern District of Virginia has held that a confidentiality provision that "indefinitely prohibited" disclosure was "not narrowly tailored to protect [the employer's] legitimate business interests, thereby rendering it unenforceable under Virginia law." *Integrated Direct Mktg., LLC v. May*, 129 F. Supp. 3d 336, 341 (E.D. Va. 2015), *aff'd*, 690 F. App'x 822 (4th Cir. 2017). Like the confidentiality provisions discussed in these cases, PHS's nondisclosure covenant

has no temporal limit. The court therefore finds that the provision is overbroad and not a narrowly tailored restraint on trade.

### 5.    PHS's Proposed Discoverable Facts

Nor can the proposed discoverable facts PHS submitted in Murphy's declaration save the noncompetition covenant. Murphy's affidavit sought to demonstrate that the company applies the restrictive covenants in the RCIAA far more narrowly than the actual wording demands. But even if true, this self-serving proffer of purported facts is irrelevant to the reasonableness of the restrictive covenants themselves, and in turn, indicates that PHS itself realizes that the restrictive covenants are invalid on their face. Moreover, PHS did not provide any discoverable relevant facts as to why the broad restrictive covenants may be necessary. In sum, the proposed discoverable facts submitted in Murphy's affidavit do not save the restrictive covenants because they create no genuine issues of fact about their reasonableness. The court accordingly finds that the restrictive covenants in the RCIAA are unenforceable as a matter of law and will enter judgment in favor of Defendants Stephens and Ventura as to Count I.

### B.    Aiding and Abetting the Breach of a Contract (Count II)

At oral argument, PHS conceded that there is no cognizable action for aiding and abetting a breach of contract under Virginia law. Count II will therefore be dismissed with prejudice.

Instead of seeking to amend its complaint, PHS's counsel made a motion at oral argument to convert Count II into "aiding and abetting a breach of fiduciary duty"—a cause of action arguably recognized in Virginia. *See AvalonBay Communities, Inc. v. Willden*, No. 1:08-

16

cv-777, 2009 WL 2431571, at *11 (E.D. Va. 2009) (citing *Halifax Corp. v. Wachovia Bank*, 604 S.E.2d 403, 411–12 (Va. 2004)) ("Virginia law allows a third party to be liable for another party's breach of fiduciary duty when that third party knowingly participated in the breach."). The court took the motion under advisement. Upon consideration, the court will deny the motion and not convert the cause of action because it is allowing PHS to file an amended complaint within 14 days of this order. PHS may therefore attempt to bring a claim for aiding and abetting a breach of fiduciary duty by pleading it if they choose to file an amended complaint.

## C.     Misappropriation of Trade Secrets Under DTSA (Count III) and VUTSA (Count V)

Under the DTSA, a trade-secret owner may bring a civil action in federal court if a trade secret is "misappropriated" and "related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1); *Bonumose Biochem, LLC v. Yi-Heng Percival Zhang*, No. 3:17-cv-00033, 2018 WL 10069553, at *6 (W.D. Va. May 21, 2018), *report and recommendation adopted*, 2018 WL 10068672. To state a claim under the DTSA, a plaintiff must allege that (1) it owns a trade secret, (2) the trade secret was misappropriated; (3) the trade secret implicates interstate or foreign commerce. *Bonumose*, 2018 WL 10069553, at *6.   Similarly, VUTSA requires a plaintiff to prove (1) the information in question constitutes a trade secret; and (2) the defendant's misappropriation of the trade secret. *Darton*, 332 F. Supp. 3d at 1036–37.

Defendants argue as a threshold matter that PHS has not adequately alleged the existence of trade secrets. The court agrees. The DTSA defines a "trade secret" as:

[A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3). VUTSA defines a trade secret as:

[I]nformation, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process that:

1. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

2. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Va. Code Ann. § 59.1-336 (2020).

In analyzing PHS's allegations regarding the protected nature of its business practices, it is instructive to review several cases where courts have found that the plaintiff pleaded sufficient facts that certain information constituted a trade secret. In *Space Systems/Loral, LLC v. Orbital ATK, Inc.*, the court found that the complaint "provide[d] factual *descriptions* of the breached documents including their relation to its technological development for robotic satellite assembly, system engineering, and research and development." 306 F. Supp. 845, 853 (E.D. Va. 2018) (emphasis added). In *Darton Environmental, Inc. v. FJUVO Collections,*

18

*LLC*, the complaint alleged information about how the technology at issue was significantly less labor-intensive and less costly than the technology the defendants used. 332 F. Supp. 3d at 1037. In *Hawkins v. Fishbeck*, the court found that the complaint "*describe[ed]* various facets of the software and related products." 301 F. Supp. 3d at 657. As a common thread in these cases, the plaintiffs' complaints described, with requisite specificity, the information constituting trade secrets. On the other hand, in *All Business Solutions, Inc. v. NationsLine, Inc.*, the court found that the plaintiff's allegations constituted "naked assertion[s]" and could not withstand a motion to dismiss. 629 F. Supp. 2d 553, 558–59 (W.D. Va. 2009) (citing *Iqbal*, 556 U.S. at 678). In that case, the plaintiff alleged that the defendant "sought . . . to appropriate and disclose the names of [its] customers, along with [its other] trade secrets and confidential information." *Id.*

PHS repeats, word-for-word, the following list of materials six times in the complaint when describing its alleged trade secrets:

> PHS's "Solar Edge" proprietary training, PHS's proprietary practices, methods, techniques, and pricing models, confidential customer database, including the entire PHS's SalesForce database, and PHS proprietary quote software, confidential sales memos, sales training manuals, and information concerning PHS's relationship with its suppliers and vendors.

(Compl. ¶¶ 78, 101, 125, 164, 172, 179.) In each of these paragraphs, the complaint merely labels this list of materials as "Trade Secrets." (*Id.*) PHS has included the words "proprietary" and "confidential" in these paragraphs, but never describes or explains what the information is and how the company derives economic value from it.

PHS stresses the amount of "time, expense, and effort" that the company has put into developing these various materials. (*See* Compl. ¶ 18.) Although marketing and sales

materials, including customer lists, can constitute trade secrets under the DTSA, plaintiffs seeking statutory protection must provide specific factual detail about the unique nature of these materials, including how they were developed and why the underlying customer information is not otherwise readily ascertainable by their competitors in the relevant market. *Art & Cook, Inc. v. Haber*, 416 F. Supp. 3d 191, 195–96 (E.D.N.Y. 2017). "That the compilation of [customer lists] may be an arduous task, involving 'tens if not hundreds of hours' of research[,] is not alone sufficient to confer protection under the DTSA." *Id.* at 196. Insofar as PHS's complaint does not provide any specific information about the unique nature of its customer identification and targeted marketing practices, including how this information is developed, ascertained, and protected, PHS's conclusory labeling of this information as trade secrets is inadequate for purposes of Rule 12(b)(6).

Ultimately, the complaint contains conclusions, not facts. The court will accordingly dismiss Counts III and V without prejudice.

## D.  Aiding and Abetting the Misappropriation of Trade Secrets Under DTSA (Count IV)

PHS also conceded at oral argument that aiding and abetting the theft of trade secrets is not a cognizable right of action under the DTSA. The court therefore dismisses Count IV with prejudice.

Even if PHS had not conceded this point, the claim is fatally flawed. In the Economic Espionage Act of 1996, Congress criminalized the theft of trade secrets, as well as attempts and conspiracies to steal trade secrets. 18 U.S.C. § 1832(a). This criminal provision "does not provide for a private right of action to redress the trade secret thefts that it proscribes." *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 271 F. Supp. 3d 835, 841 (E.D. Va.

2017). In 2016, Congress enacted the DTSA, which amended the Economic Espionage Act by creating a private right of action in certain circumstances. *Id.*; 18 U.S.C. § 1836(b) ("An owner of a trade secret that is misappropriated may bring a civil action *under this subsection* if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." (emphasis added)). Neither relevant provision mentions aiding and abetting. *See* §§ 1832(a), 1836(b).

When Congress establishes a crime, Congress must also provide a private right of action for citizens to enforce the criminal statute through civil actions. *See Doe v. Broderick*, 225 F.3d 440, 447–48 (4th Cir. 2000). In other words, citizens cannot enforce criminal statutes without Congress's express authorization. *See id.* Congress neither established a crime for "aiding and abetting" the theft of trade secrets nor created a private cause of action to enforce such a provision. Holding otherwise would read into the statute an additional private right of action that Congress never expressly provided. *See Steves and Sons*, 271 F. Supp. 3d at 840–43 (holding that a civil plaintiff could not bring a claim for conspiracy to violate the DTSA because Congress did not expressly provide the civil cause of action).

### E.   Common Law Unfair Competition (Count VI)[4]

According to the Virginia Supreme Court, "[t]he essential element of unfair [competition] is deception, by means of which goods of one dealer are palmed off as those of another, whereby the buyer is deceived, and the seller receives the profit which, but for

---

[4] As an initial matter, Defendants argue that PHS's unfair competition claim is preempted by its VUTSA claim. PHS does not dispute the claim's preemption but clarifies that it brings the unfair competition claim in the alternative in the event the court dismisses the VUTSA claim. Because the court dismissed the VUTSA claim without prejudice, the court considers PHS's unfair competition claim as well.

such deception, he would not have received." *Benjamin T. Crump Co. v. J. L. Lindsay, Inc.*, 107 S.E. 679, 684 (Va. 1921). The threat of unfair competition must be directed "not at the complaining party, but at its customers or other third parties." *Monoflo Int'l, Inc. v. Sahm*, 726 F. Supp 121, 128 (E.D. Va. 1989). Virginia adheres to a "narrow" definition of unfair competition. *Id.* at 127.

In *Monoflo*, like this case, the plaintiff alleged that the defendant had engaged in wrongful business conduct, including misrepresentations and threats of bringing criminal proceedings. *Id.* at 126. But the court highlighted that improper behavior must be aimed at the competitor's customers, *not at the competitor itself. Id.* at 128. Because the defendant in *Monoflo* had threated to bring a criminal action against the plaintiff, the defendants' conduct did not injure competition because there was no effect on the plaintiff's customers. *Id.* The court further noted that to hold otherwise would provide for an unwarranted expansion in Virginia's narrow unfair-competition law. *Id.* Likewise, in *Phoenix Renovation Corp. v. Rodriguez*, the court dismissed the plaintiff's unfair competition claim because there was "no allegation that [the defendant] is attempting to deceive the buying public by holding itself out as [the plaintiff]." 403 F. Supp. 2d 510, 518 (E.D. Va. 2005).

PHS's unfair competition fails because PHS does not allege (1) that Sigora is holding itself out as PHS to deceive consumers; (2) that Sigora is "palming" off its services as PHS's services; or (3) that Defendants have in fact deceived PHS's customers. In PHS's opposition brief, it claims that it "is complaining about an effect on their customers, namely, that their customers may be poached through Sigora's use of PHS's practices as their own." (ECF No. 16 at 17.) As the argument goes, "by utilizing PHS's marketing techniques and passing them

off as their own, Sigora has deceived customers who respond to such efforts." (*Id.*) But such allegations of deception are glaringly absent from the Complaint. PHS alleges that Defendants have "used the misappropriated Trade Secrets of PHS to call and contact certain current customers and/or suppliers and/or vendors of PHS." (Compl. ¶ 107.) But this allegation (and the others like it) do not establish the "essential element" of "deception" under Virginia law, nor do they establish that Sigora held itself out to the public as PHS. The court will therefore dismiss Count VI without prejudice.

## F.   Civil Conspiracy (Count VII)

Next, PHS alleges that Defendants conspired amongst themselves to violate the employment agreements, misappropriate its trade secrets, and otherwise damage its business. Virginia code states in relevant part: "Any two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of . . . willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever . . . shall be jointly and severally guilty of a Class 1 misdemeanor." Va. Code Ann. § 18.2-499 (West 2020). Section 18.2-500 creates a private cause of action for parties injured under this statute, allowing recovery of treble damages, attorneys' fees, and costs. *Id.* § 18.2-500.

For this claim, a plaintiff must establish: "(1) a combination of two or more persons for the purpose of willfully and maliciously injuring plaintiff in his business[;] and (2) resulting damage to the plaintiff." *Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 317 (Va. 2014) (alteration in original). Stated differently, a plaintiff must allege that defendants "combined together to effect a preconceived plan and unity of design and purpose." *Owen v. Liberty Univ.*, No. 6:19-cv-00007, 2020 WL 1856798, at *17 (W.D. Va. Apr.

13, 2020) (citation omitted). Moreover, the plaintiff must "at least plead the requisite concert of action and unity of purpose . . . *in more than mere conclusory language.*" *Id.* (emphasis added) (internal quotation marks and citation omitted). A claim for civil conspiracy fails if the plaintiff "fails to allege with any specificity the persons who agreed to the alleged conspiracy, the specific communications amongst the conspirators, or the manner in which any such communications were made." *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 347 (4th Cir. 2011) (affirming the dismissal of a civil conspiracy claim under 42 U.S.C. § 1985(3) on a motion to dismiss).

In *Owen*, the court dismissed a civil conspiracy claim because the complaint alleged that the defendants "conspired" together, but never alleged any facts that the defendants had an "agreement" or "meeting of the minds." *Owen*, 2020 WL 1856798, at *17. The court further found that the complaint alleged "parallel" action, but that allegation was not enough to state a cognizable claim. *Id.*

Here, PHS alleges the following in support of its civil conspiracy claim:

- Sigora has in the past and continues to solicit and/or induce current and/or former PHS employees to leave PHS to work for Sigora and/or compete against PHS by working with Sigora while still bound by the restrictive covenants and obligations under the Agreement and/or disclose to Sigora Confidential Information and/or proprietary information and/or trade secrets belonging to PHS in violation of their obligations to PHS and for other improper and/or unlawful purposes. (Compl. ¶ 42.)

- Defendants have knowingly and willfully agreed, combined, and conspired to engage in conduct for and/or in furtherance of an unlawful purpose and/or through and by unlawful means, and have entered into an express or implied agreement to accomplish the common design or scheme, by knowingly and willingly soliciting PHS [*sic*] current and/or former employees to violate their restrictive covenants not to compete and/or obligations to PHS to keep Trade

Secrets confidential, and/or misappropriating Trade Secrets belonging to PHS for the express purpose of competing against PHS in the renewable energy business by unlawful and/or fraudulent means. (*Id.* ¶ 151.)

- One or more of Defendants committed an overt act calculated to accomplish the agreement. (*Id.* ¶ 152.)

These are all legal conclusions. PHS merely reiterates the legal elements of a civil conspiracy claim instead of proffering any specific examples of how Defendants' conduct satisfied those requirements. Even taking as true that Sigora solicited Stephens and Ventura to join its company, and they individually decided to leave PHS and join Sigora, that fact does not establish that they *all* mutually *agreed* to harm PHS. Indeed, it is commonplace for companies to recruit employees from their competitors, and such conduct, by itself, does not give rise to an inference of concerted unlawful activity. Specifically, PHS does not allege how Sigora communicated with Stephens and Ventura (or if Stephens's and Ventura's departures from PHS were even related), when those communications occurred, or generally what was discussed. Without those basic facts, PHS cannot make out a claim for civil conspiracy. The court accordingly dismisses Count VII without prejudice.

## G.    Tortious Interference with Contract (Count VIII)

The elements for a claim of tortious interference with contract are: "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Duggin v. Adams*, 360 S.E.2d 832, 835 (Va. 1987).

PHS's claim fails on the first element because it is based on Stephens's and Ventura's noncompete agreements. As discussed above under Count I, the restrictive covenants are unenforceable under Virginia law. In the event that PHS seeks to bring the claim again based on alleged business expectancies, the court will dismiss Count VIII without prejudice.

## H.   Unjust Enrichment (Count X)

### 1.   PHS Can Plead an Unjust Enrichment Claim in the Alternative

As a threshold matter, Defendants argue that PHS's unjust enrichment claim is preempted by its VUTSA claim and because an express contract allegedly governs the allegations. PHS does not dispute that the claim would be preempted, but states that it brings the claim in the alternative (despite no indication in the complaint). In response, Defendants argue that an unjust enrichment claim cannot be plead in the alternative because such a claim is inappropriate *even if* the validity of the express contract is disputed (as it was here).

The parties do not dispute that the existence of an express contract covering the same subject matter as the parties' dispute precludes a claim for unjust enrichment. *See CGI Federal Inc. v. FCi Federal, Inc.*, 814 S.E.2d 183, 190 (Va. 2018). But Defendants' assertion that an unjust enrichment claim cannot be plead in the alternative when the validity of the express contract is disputed is incorrect.[5] District courts in this circuit have repeatedly held that a plaintiff is not barred from pleading an unjust enrichment claim in the alternative "where the existence of a contract concerning the subject matter is in dispute." *Chubb & Son*

---

[5] Defendants incorrectly rely on *CGI*. 814 S.E.2d at 191. There, the plaintiff brought claims for fraudulent inducement, breach of contract, and unjust enrichment. *Id.* at 185. The jury found that the contract was procured by fraud (and therefore invalid), but the plaintiff "affirmed" the contract and sued for damages instead of seeking rescission. *Id.* at 191. Because the express contract remained in effect at the plaintiff's option, it could not pursue an unjust enrichment claim. *Id.* That is not the case here.

*v. C & C Complete Servs., LLC*, 919 F. Supp. 2d at 666, 678 (D. Md. 2013) (citation omitted); *Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc.*, 190 F. Supp. 2d 785, 792 (D. Md. 2002) ("[A]lthough [the plaintiff] may not recover under both contract and quasi-contract theories, it is not barred from pleading these theories in the alternative where the existence of a contract concerning the subject matter is in dispute."). PHS may therefore bring an unjust enrichment claim in the alternative.

### 2.    But PHS Fails to State a Claim for Unjust Enrichment

Unjust enrichment is a quasi-contract claim that permits recovery, "where, in fact, there is no contract, but where circumstances are such that justice warrants a recovery as though there had been a promise." *Swedish Civil Aviation Admin.*, 190 F. Supp. 2d at 792 (citation omitted).  The elements for unjust enrichment are: "(1) the plaintiff's conferring of a benefit on the defendant, (2) the defendants' knowledge of the conferring of the benefit, and (3) the defendant's acceptance or retention of the benefit under circumstances that render it inequitable for the defendant to retain the benefit without paying for its value." *Microstrategy, Inc. v. Netsolve, Inc.*, 368 F. Supp. 2d 533, 537 (E.D. Va. 2005) (citation and internal quotation marks omitted).

Upon review of the complaint, PHS has not adequately pleaded facts upon which relief can be granted. PHS never alleges that it intentionally conferred a benefit on Defendants. Indeed, PHS alleges the opposite—that Defendants wrongfully took its confidential information without its permission. In support of this claim, PHS stated that "Defendants obtained benefits from PHS" and "[g]iven the nature of the alleged conduct and circumstances, it would be unjust to allow Defendants to retain these benefits." (Compl.

¶¶ 168–69.) But this allegation misses the point of unjust enrichment, which encompasses a party conferring a benefit with the expectation that it would be repaid. *See Swedish Civil Aviation Admin.*, 190 F. Supp. 2d at 792. PHS accordingly fails to allege sufficient facts to state a claim for unjust enrichment, and the court will deny Count X without prejudice.

## I.   Remedial Claims (Counts IX, XI, and XII)

PHS's final three counts must be dismissed with prejudice. PHS brings claims for (1) turnover of property as to PHS and for an accounting (Count IX); (2) preliminary and permanent injunctive relief (Count XI); and (3) punitive damages under the DTSA and VUTSA (Count XII).

To start, Defendants argue, and PHS concedes, that a claim for turnover of property (*i.e.*, replevin) is not a cognizable claim in Virginia because it has been abolished. Va. Code Ann. § 8.01-218 (West 2020) ("No action of replevin shall be hereafter brought."). The court will accordingly dismiss Count IX with prejudice.

Turning to the others, PHS concedes that these "claims" are in fact remedies, and not individual causes of action. *See Fare Deals, Ltd. v. World Choice Travel.com, Inc.*, 180 F. Supp. 2d 678, 682 n.1 (D. Md. 2001) (citation omitted) ("[Plaintiff] has also asserted, as a separate count, a request for injunctive relief. However, a request for injunctive relief does not constitute an independent cause of action; rather, the injunction is merely the remedy sought for the legal wrongs alleged in the nine substantive counts." (citation omitted)); *Eslami v. Global One Commc'ns, Inc.*, 48 Va. Cir. 17, 1999 WL 51864, at *7 (1999) ("Under Virginia law, punitive damages are not a cause of action, but a remedy."). PHS nevertheless argues that these claims should not be dismissed because it has brought other substantive causes of

action upon which the court can grant relief.

District courts summarily dismiss remedies pleaded as causes of action. *See, e.g.*, *Bloch v. Exec. Off. of the President*, 164 F. Supp. 3d 841, 862–63 (E.D. Va. 2016). In *Bloch*, the court dismissed a "count" for injunctive relief, stating: "Of course, injunctive relief is a remedy and not a cause of action and it is improper to frame a request for an injunction as a separate cause of action." *Id.* (citation and internal quotation marks omitted). The court dismissed the claim with prejudice. *Id.* ("Because a remedy should not be pled as a cause of action, plaintiff need not be given leave to amend his complaint as no new allegations can save Count XV.").

The court notes that this is more a matter of form than of substance. While the court dismisses "Counts" IX, XI, and XII with prejudice, this opinion does not preclude PHS from seeking these remedies in a prayer for relief if it files an amended complaint or a motion for a preliminary injunction.

## IV.   CONCLUSION

For the reasons stated above, the Defendants' motion to dismiss (ECF No. 9) will be granted. Specifically, the court will dismiss Counts III, V, VI, VII, VIII, and X without prejudice and dismiss Counts II, IV, IX, XI, and XII with prejudice. The court will further enter judgment in favor of Defendants on Count I. Finally, the court will grant PHS leave to file an amended complaint within 14 days of this order if it chooses to do so. A separate order will issue.

The Clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

**ENTERED** this 30th day of August, 2021.

_/s/ Thomas T. Cullen_
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE